**Humphrey L. SHUFORD, Plaintiff,**

**Connie Johnson, Karen A. Newton, Myra P. Davis, and Sheryl B. Threatt, individually and on behalf of a class and subclass of persons similarly situated, Plaintiffs–Intervenors,**

**Kenneth A. Brackins, Plaintiff–Intervenor,**

v.

**ALABAMA STATE BOARD OF EDUCATION, et al., Defendants.**

**Civil Action No. 89–T–196–N.**

United States District Court, M.D. Alabama, Northern Division.

May 23, 1997.

---

Joe R. Whatley, Jr., Cooper, Mitch, Crawford, Kuydendall & Whatley, Birmingham, AL, for Connie Johnson.

Rebecca H. Hunt, Haskell, Slaughter, Young, Johnston & Gallion, Birmingham, AL, for Karen Newton.

Thomas T. Gallion, III, Haskell, Slaughter, Young, Johnston & Gallion, Montgomery, AL, Beverly Baker, Richard Walston, Rebecca Hunt, Michael K.K. Choy, Haskell, Slaughter, Young, Johnston & Gallion, Birmingham, AL, for Myra P. Davis.

J. Mason Davis, Sirote & Permutt, Birmingham, AL, J. Allen Schreiber, Gerald Alan Templeton, Catherine L. Hogewood, Tessa Thrasher, Lloyd, Schreiber & Gray, P.C., Birmingham, AL, Renee Culverhouse, Office of General Counsel, State of Alabama, Dept. of Postsecondary Education, Montgomery, AL, for Alabama State Bd. of Education.

## MEMORANDUM OPINION

McPHERSON, United States Magistrate Judge.

This action was originally filed as a class action by plaintiff Humphrey Shuford ["Shuford"], a black male, who alleged racially discriminatory employment practices in Alabama's postsecondary educational system. Pursuant to the parties' stipulation, the court has previously certified a class of black plaintiffs.[1]

Two females later filed motions to intervene, claiming discrimination in the same system against females as a class: Connie Johnson ["Johnson"] on 20 April 1991, and Karen Newton ["Newton"] on 21 September

---

1. On 15 March 1994, this court entered an order approving a proposed partial consent decree which resolved the race-based claims against the postsecondary system. The decree provided, in pertinent part, that "no employee or applicant for employment or promotion, including applicants for presidential, full-time faculty and other administrative and supervisory positions, shall be discriminated against on the basis of any impermissible criterion or characteristic including without limitation race, *sex*, or age". *See Shuford v. Alabama State Bd. of Educ.*, 846 F.Supp. 1511 (M.D.Ala.1994). [Emphasis added]

1993.[2] The court granted Johnson's motion on 12 June 1991 and granted Newton's motion on 19 October 1993. Thereafter, on 22 October 1993, this court entered an order certifying a class of "all female professional educators who have been or who may in the future be victims of sex-based discrimination with respect to hiring, assignment, salary, promotion, demotion, dismissal and other terms and conditions of employment in Alabama's postsecondary system".[3] Johnson and Newton were named as class representatives.

On 3 February 1994, two other females, Myra P. Davis ["Davis"] and Sheryl B. Threatt ["Threatt"], filed a motion to intervene for the purpose of asserting individual claims and class claims on behalf of a subclass of black females, and on 2 March 1994, the court granted their motion.

This cause is before the court on the individual claims of three members of the female class,–Newton, Davis, and Threatt–for relief.[4] The female litigants base their claims on the following: Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.A. §§ 2000e through 2000–17; the Fourteenth Amendment to the United States Constitution, as enforced through 42 U.S.C.A. § 1983; and § 901(a) of Title IX of the Education Amendments of 1972, as amended, 20 U.S.C.A. § 1681(a). The court exercises its jurisdiction over the subject matter of the individual claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4) and pursuant to 42 U.S.C. § 2000e–5(f)(3).

Newton claims that, in spite of her qualifications, she was denied the positions of administrative head, provost or interim provost at either Northwest Shoals Community College or Bevill State Community College ["Bevill"]. She further contends that she was demoted and excluded from her administrative duties after she expressed an interest in being appointed to provost, interim provost or administrative head of campuses at those colleges following the administrative mergers of one Northwest Alabama Community College ["Northwest Alabama"] campus with Bevill and of the merger of a second Northwest Alabama campus with Shoals Community College ["Shoals"].

Davis contended that she was denied a position of Director of Admissions at Lawson State Community College ["Lawson"] in Bessemer, and Threatt contended that she was denied a position of Director of Financial Aid at Lawson.

The plaintiffs seek declaratory and injunctive relief and attorney's fees and expenses. For the reasons which follow, and based upon the evidence presented, the court concludes that judgment should be entered in part for the plaintiffs and in part for the defendants.

## I. PROCEDURAL HISTORY

On 23 June 1994, pursuant to the consent of counsel and of the individual parties—

---

**2.** Newton filed a charge of discrimination with the Equal Employment Opportunity Commission on 5 August 1993 (PX–46). 42 U.S.C.A. § 2000e–5(b) (West 1994). The United States Department of Justice issued her a Right–To–Sue notice on 14 December 1993. 42 U.S.C.A. § 2000e–5(f)(1).

**3.** The Female Intervenors' Consent Decree addressed *supra*, defined a female sub-class of plaintiffs, using the same language as the Shuford class, except that the word "female" was substituted for the word "black". (See Doc. # 455, p. 4) It also defined a sub-class of all black females as follows: "A sub-class of all black citizens represented by Humphrey Shuford and all women represented by Johnson and Newton, which is further and more specifically defined as a sub-class of all black female citizens who have been or will be denied employment in or promotion to presidential, full-time faculty and other administrative and supervisory positions covered by salary schedules A, B, C, and D at community, junior and technical colleges in the Alabama System of Postsecondary Education. If a college maintains a full-time *administrative* or supervisory position which is not covered or defined on the A, C, C, or D salary schedule, such position shall also be included within the scope of the plaintiff sub-class and the coverage of this decree". *See Shuford v. Alabama State Bd. of Educ.*, 897 F.Supp. 1535 (M.D.Ala.1995).

**4.** On 2 March 1994, the court also permitted Kenneth A. Brackins ["Brackins"], a black male, to intervene in this action. Brackins consented to disposition of his claims by the Magistrate Judge on 21 June 1993; however, on 5 July 1994, before the trial began, he filed a voluntary dismissal of all claims, with prejudice, against the defendants. The Magistrate Judge entered an order dismissing Brackins' claims on 5 August 1994.

Newton, Davis, and Threatt—the court referred the individual claims which they filed to the undersigned Magistrate Judge "for all further proceedings and the entry of judgment in accordance with 28 U.S.C.A. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure". A non-jury trial of the individual claims was conducted during thirteen days in August and September, 1994.

## II. BACKGROUND

### A. *The Consent Decree Providing Relief to African Americans*

The first Shuford consent decree resolved the class claims of the black plaintiffs and plaintiff Humphrey Shuford's individual claim (See Doc. # 107). In the 15 March 1994 order which approved the decree (Doc. # 197), the court made several findings of fact regarding defendants' conduct with respect to the class, and the Magistrate Judge takes judicial notice of those findings. They include the following:

1. Defendants have resisted the implementation of both court-ordered and court-approved relief; defendants have failed to implement uniform, objective criteria in their employment practices (Doc. # 107, p. 28).

2. The evidence establishes a prima facie case of [race] discrimination against individual class members (pp. 29, 33).

3. The defendants have consciously failed to establish cognizable and reviewable employment standards (p. 35).

4. Vacancies at many institutions are not advertised, are left open for extended periods of time, and are filled on a purely subjective basis without reliance on any objective minimum qualifications (pp. 3–4).

### B. *The Consent Decree Providing Relief to Females*

On 11 August 1995, the court entered an order approving a second Partial Consent Decree pertaining to the class claims of intervenors Johnson, Newton, Davis, and Threatt and the individual claims of Johnson (Doc. # 454). The court made the following findings in the order, of which the Magistrate Judge takes judicial notice:

1. "[G]ender stereotypes of long standing are perpetuated in hiring and promotion practices," which "is manifested by the disproportionately few women who hold key decision-making posts in the System's institutions" (p. 46).

2. There has been discrimination against women in the postsecondary system over time (p. 47).

3. "For every salary schedule [in use at postsecondary institutions], a greater percentage of men than women is less qualified", and "it is likely that the discrepancy shows that men are being favored in the relevant economic sphere" (p. 59).

4. "Together, the historical, anecdotal, and statistical evidence more than shows substantial evidence of past discrimination against women in the relevant economic sphere." (p. 63).

### C. *Stipulated Facts* [5]

The Alabama State Board of Education ["ASBE"] is a political subdivision of the State of Alabama which consists of eight (8) elected members. ASBE exercises, through the State Superintendent of Education and his professional staff, general control and supervision over the public schools of Alabama, except institutions of higher learning which by law are under the general supervision and control of a board of trustees. § 16–3–11, Code of Alabama (1987). ASBE, which meets and has its offices in Montgomery, is entrusted by law with the responsibility of general supervision and control of the public junior colleges, technical schools and community colleges in Alabama (the Postsecondary System).

---

5. The parties stipulated to many of the background facts. They are reproduced in this section to provide the context of the Magistrate Judge's findings of fact. All of the findings of fact, whether derived from the parties' stipula-tions, the consent decrees, or the trial testimony, pertain only to the evidence that is necessary to determine whether the female intervenors have suffered individual discrimination on account of their gender.

Dr. Fred Gainous ["Gainous"] is the chancellor–or chief executive officer–of the postsecondary education department of the state department of education and, subject to the approval of the ASBE, directs all matters involving the junior colleges, community colleges and technical schools pursuant to the policies of the ASBE. By lawful delegation, Gainous has the authority to take any action on behalf of the ASBE with respect to post-secondary education. The president of each postsecondary institution is responsible to Gainous for the day-to-day operation of each school.

At all times pertinent to this court's findings and discussion, Larry McCoy ["McCoy"] was president of Northwest Shoals, and Harold Wade ["Wade"] was president of Bevill. McCoy and Wade were authorized by state law, subject to qualification prescribed by the ASBE and subject to Gainous' supervision, to appoint the administrators, faculty members and staffs of their respective institutions.

All of the community colleges mentioned in this lawsuit are units of the state system of postsecondary education and are governed by and are subject to the supervision and control of the ASBE and Gainous.

### D. *Findings of Fact*

#### 1. *Appointments of McCoy and Wade During Mergers*

Fred Gainous, who acts as an agent of the Alabama State of Board of Education, is solely responsible for implementing the Board's policies in the state's postsecondary system and for monitoring the institutions'

adherence to those policies.[6] The Board itself adopts salary schedules and creates all policies that govern the two-year institutions.[7] It also allocates expenditures by the institutions and appoints the presidents of the institutions.[8]

At the time of trial, Larry McCoy ["McCoy"] was president of Northwest Shoals Community College ["Northwest Shoals"], a medium-sized community college with approximately 4,000 students and approximately 75–85 full-time faculty members.[9] McCoy was also president of the Alabama College System Presidents' Association, which consists of all post-secondary college presidents who represent 32 institutions. Five of the presidents are female, and one, the president of Bishop State Community College in Mobile, Alabama, is a black female.[10]

McCoy holds bachelor's and master's degrees, and in 1981, he received an education doctorate from Nova University.[11] McCoy has held several administrative positions at colleges in Alabama, including Dean of Student Development at Athens State College and President of Muscle Shoals State Technical College.[12]

McCoy and all other community college presidents are on the A pay grade level. The other pay levels consist of the following: (1) Deans or administrators – B level; (2) Lower level, non-faculty administrators and professionals – C level; (3) Faculty – D level; (4) Secretaries and other clerical employees – E level.[13]

---

6. Citations to the non-jury trial transcript in this case will be somewhat unusual because the court reporter did not paginate the transcript consecutively throughout the several volumes. Instead, the trial transcript is categorized or divided by trial dates and by volumes per trial date. For example, citations to the first day of trial might be to "Trial Transcript, 7/5/94, Vol. 1, p. X". On each new trial date, the transcript begins with a new "Volume I". Thus, the same page number may be correctly cited for two or more witnesses, but the testimonies will have occurred on different dates and will thus be found in the appropriate volume for the specific date cited. In addition, because some witnesses were recalled, some of the facts are reflected in testimony recorded on different dates and reflected in different volumes.

7. Trial Transcript ["TT"], 7/29/94, pp. 35–36.

8. *Id.*

9. TT, 7/6/94, vol. TT, pp. 107, 156; DX 68–2, 68–3.

10. TT, 7/6/94, pp. 138–140.

11. 9/22/88 record, pp. 73–74.

12. *Id.*, pp. 78–79.

13. The pertinent salary schedule is the one in use during the 1993–94 scholastic year, admitted as Davis/Threatt Exhibit (DTX) 22. It sets forth all of the regulations governing salary designations

Also at the time of trial, Harold Wade ["Wade"] was president of Bevill State Community College. Wade was awarded his bachelor's and master's degrees, and a doctorate in higher education administration (1988) from the University of Alabama.[14] Wade moved from teaching and administrative positions in secondary schools to the postsecondary system, becoming Director [president] of Walker County Trade School.[15]

During the period February through May, 1993, there was a merger involving three community college campuses in northwest Alabama. The mergers are best explained by reference to Defendants' Exhibits 68–1, 68–2, and 68–3. Following is a summary of the mergers:

a. **Shoals Community College** operated from January, 1989 to May, 1993. It then merged with the Phil Campbell ["PC"] campus of the former *Northwest Alabama Community College* to become the *Northwest Shoals Community College.* The new community college operates three campuses at Phil Campbell, Muscle Shoals, and Tuscumbia, Alabama, and Larry McCoy was president at the time of trial.

b. **Northwest Alabama Community College** ["Northwest Alabama"] operated two campuses at Phil Campbell and Hamilton, Alabama. In May, 1993, the PC campus was merged with **Shoals Community College,** and the Hamilton campus ["Hamilton"] was merged with **Bevil State Community College** ["Bevill"]. Northwest Alabama no longer exists.

c. **Bevill** operated two campuses at Sumiton and Brewer, Alabama. In May, 1993, it added the Hamilton campus of the former **Northwest Alabama** and now operates three campuses.

On 1 February 1993, before the mergers were complete, McCoy was notified by the chancellor, Dr. Fred Gainous ["Gainous"] that he was being re-assigned as the administrative head of PC–Northwest Alabama. On the same date (1 February 1993), Gainous advised Wade that he was being assigned as administrative head at Hamilton and given the same authority.[16]

In general, according to McCoy, positions at the community colleges are filled through advertising or through the use of a selection committee. The selection committee consists of seven individuals appointed to screen and to make recommendations regarding candidates. Upon his appointment, McCoy had a selection committee consisting of five individuals, two of whom were black women.[17]

## 2. Newton's Re-assignments and McCoy's Appointments at Northwest

Plaintiff Newton holds bachelor's and master's degrees, and a Ph.D. degree in higher education administration from the University of Alabama (1989).[18] She was first hired into the Alabama postsecondary system in January, 1986 as a Title III Coordinator at Northwest Alabama Junior College.[19] She was placed on the C–3 pay level, and she held the position for three years.[20] Thereafter Newton moved through a succession of positions at that institution, including Development Officer,[21] Chair of the Business and Computer

---

for permanent, full-time employees in the postsecondary system. In that year, the following salary ranges were in use: **Schedule A**–$65,491 to $81,576; **Schedule B**–$49,959 to $65,090; **Schedule C–1**—$43,464 to $58,595; **Schedule C–2**–$37,754 to $52,885; and **Schedule C–3**–$45,436 to $48,291.

14. TT, 815/94, vol. 1, p. 4.

15. *Id.,* pp. 5–17. In the late 1970's, Wade added academic instruction to the school, and its name was changed to Walker State Technical College. p. 20. Wade's title was then changed from Director to President. p. 33.

16. *Id.,* p. 111.

17. TT, 8/4/94, pp. 140–145, 152. McCoy testified that each time he had a selection committee, he appointed black women to it. *Id.,* pp. 145, 196.

18. *Id.,* p. 31.

19. Northwest Alabama Junior College was a forerunner of Northwest Alabama Community College.

20. *Id.,* p. 39.

21. Newton received a commendation for her work as Development Officer. PX–8.

Information Systems Division (1988),[22] and Dean of Students (1990).[23] As Dean of Students, Newton was responsible for students on both the PC and Hamilton campuses.

From the initial date of Newton's employment at Northwest, there were three women in administrative positions at the school. The other two interviewed her; one of them later retired, and the other –a Vice–President– remained Newton's supervisor until she resigned. Upon her resignation, only Newton remained at Northwest as a female in an administrative position.[24] Newton was still Dean of Students when Larry McCoy was re-assigned to Northwest Alabama in early 1983. She was located on the PC campus and was paid on the B pay level.[25]

In February, 1993, without consulting or notifying Newton, and without advertising the positions, McCoy met with Wade regarding their respective campuses and made two critical decisions: they decided to appoint Newton as Dean of Instruction and Student Services at PC and to appoint Clyde (Sonny) Nix ["Nix"], a male, as Dean of Instruction and Student Services at Hamilton.[26]

In mid-March, 1993, McCoy appointed Olan Burcham ["Burcham"], a male, to the position of Interim Provost at PC.[27] There is no evidence that any of these positions was advertised or that applicants applied for the positions. The evidence further reflects that

McCoy and Wade did not consider anyone other than the persons actually appointed to the positions.[28]

McCoy had previously told Newton that he wanted a person with a doctorate degree in charge of the instructional program at PC, and he knew that Burcham did not have a doctorate.[29] Moreover, before his appointment as Interim Provost at PC, Burcham had not served in a dean's position.[30] McCoy was not required to secure special permission from Gainous before re-assigning Newton, but he did secure special "approval from the Chancellor" for Burcham's appointment.[31]

McCoy assured Burchamn that the interim provost position would not be permanent, and Burcham agreed that he would not apply if it became a permanent position.[32] Burcham also advised McCoy that he would retire before he was 62 years old. McCoy wanted Burcham to take the position because of his "good rapport" with the college employees.[33] Although McCoy told Burcham that the position would not last for more than one year, it lasted for 14 months.[34] In September, 1993, Burcham was placed on the B pay level and received a salary of $65,090.00.[35] Burcham retired at the end of the 14–month period, and the position was not utilized after his retirement.[36]

22. In this position, Newton had responsibility for two campuses – Tuscumbia and Phil Campbell. TT, 8/4/94, p. 45.

23. Id., pp. 43–51. See also Newton's resume, PX–24.

24. Id., pp. 53–54.

25. Id., p. 139.

26. When McCoy went to PC, Newton was the only female at the B pay level working under him. After her transfer to Hamilton, there were no women at the B level, and three men at the B level who were working under McCoy. Id., p. 113; TT, 7/5/94, p. 56. The "provost" is in charge of the day-to-day operations of the campus. TT, 8/4/94, p. 168.

27. Id., pp. 184, 205; TT, 8/4/94, p. 38.

28. Burcham was a high school teacher from 1960–1963, and later taught math for three years at a military college. In 1967, he began teaching math and science at Northwest Alabama State

Junior College. He became chairman of the math and science division and president of the faculty association. The departmental chair, however, was the only administrative position that he had held prior to his appointment as interim provost. TT, 9/22/94, pp. 94–97.

29. TT, 715/94, pp. 117–118. Burcham had been a math teacher for 28 years and a division chair.

30. Id.

31. Id., pp. 116–117.

32. TT, 9/22/94, pp. 106, 108.

33. Id., pp. 109, 111.

34. TT, 9/22/94, pp. 158–160.

35. Id., pp. 108, 128–129.

36. TT, 8/4/94, pp. 17, 206.

In late April, 1983, Newton, who was still at PC, had a meeting with McCoy in which he directed her to see Wade about her assignment to a position at Hamilton. Newton asked McCoy for an administrative position at PC, but McCoy told her to see Wade at Hamilton. Newton later met with Wade and told him that "the only position that [she] would be interested in at the Hamilton campus would be that of Provost".[37] Wade announced that he had already appointed Nix to that position.

In August or September, 1993, McCoy appointed Dr. Randy Parker ["Parker"], a male, to a newly-created position of Vice–President of Northwest Shoals. McCoy said that he created a Vice–President position because he needed assistance in monitoring the two campuses (PC and Hamilton), and because of a 1991 suggestion from the Southern Association of Schools and Colleges ["SACS"] that a Vice–President position be created.[38] The new position was not advertised, and McCoy did not give Newton (or apparently others) an opportunity to apply for the vice-presidency.[39]

McCoy recommended, and Gainous approved, Parker for the position. Parker, according to McCoy, had "gone through a progression to get" the Vice–Presidency, including service as Dean of Instruction, and work with the faculty and staff.[40] Parker, who has been employed at Northwest Shoals since 1988, holds bachelor's and two master's degrees, and he also holds a doctorate in higher education and administration from the University of Alabama (1986).[41] He has held several teaching and administrative positions at technical and community colleges in Alabama.[42]

Parker did not interview for the vice-presidency nor was he interviewed by a screening committee.[43] As vice-president, Parker acts on behalf of the president (McCoy) in his absence, and he is responsible for supervising the deans, including Newton. When PC was merged with Northwest Shoals in 1993, Parker became responsible for overseeing that campus as well.[44] In that connection, Burcham, as interim provost at PC, reported to Parker and acted as Chief Instructional Officer for PC in Parker's absence. Since Burcham's retirement, Jackie Burrow ["Burrow"], a male who serves as the Dean of Physical ·Affairs, has been in charge of the PC campus.[45]

Gainous was involved with the promotional and other placement decisions at Northwest Alabama and at Bevill –including Newton's non-selection by McCoy.[46] Gainous· testified that McCoy told him that there had been criticism of Newton by the faculty and there were problems regarding · her work performance.[47] Gainous did not construe McCoy's evaluation of Newton "as a criticism but as an observation of what he found at the institution"; in fact, Gainous did not know if Newton had contributed to problems at her school prior to the merger, but he had heard that Newton was ineffective in administering Student Services.[48]

### 3. Wade's Appointment of Clyde Nix, Ed Meadows, and James Wade

At the time of trial, Wade was president of Bevill. In April, 1993, Wade appointed Clyde Nix, a male who had been Dean of Instruction for both Northwest Alabama campuses, to the position of Provost of the Hamilton campus. Nix has a doctorate in

37. TT, 7/5/94, pp. 72, 76.

38. TT, 8/4/94, p. 128; TT, 9/22/94, pp. 86–87, 167.

39. Id., p. 176.

40. TT, 8/4/94, pp. 28–29,39.

41. TT, 8/3/94, pp. 24.

42. Id., pp. 8–18.

43. Id., pp. 54–55.

44. Id., pp. 31–32,39–40.

45. Id., pp. 45, 56–57.

46. See PX—51, which includes Gainous' letters to McCoy approving of the appointments and salary designations for Parker. See also PX—44 regarding Harold Wade's appointment as vice-president at Bevill.

47 **TT, 8/4/94, p.**178.

48. Id., pp. 179, 188, 191.

philosophy and over 20 years' experience in instruction and administration in the two-year college system.[49]

In September, 1993, Wade promoted Ed Meadows ["Meadows"], a male, to the position of Vice–President and his brother, James Meadows to the position of Provost at the Sumiton campus of Walker State Junior College.[50] None of the positions was advertised. Each appointee received a raise, and each of the positions was on the B pay level.[51]

Meadows held two master's of science degrees, a master's of arts degree, and a doctoral degree (1979) from Ball State University.[52] He had also taught at Ball State, two community colleges in Mississippi, the University of Mississippi, and Alcorn State University.[53] Meadows had also held administrative positions at one of the Mississippi community colleges (associate dean), and at Alabama's Shelby State Community College (dean of academic affairs) and at Walker State (dean of instruction).[54] He had previously served as provost of Walker State.[55]

Approximately five months before Wade's promotion of Dr. Meadows to the vice-presidency of Bevill, Dr. Meadows had successfully requested Wade to assign Dr. James Wade (Harold Wade's brother) as provost of the Walker campus. James Wade was then serving as the assistant dean of instruction.[56]

Wade recalled that he had met with plaintiff Newton before her transfer to the Hamil-ton campus, and that during the discussion, she had asked to be appointed Provost. Wade told her that he was already committed to giving the position to Nix, and suggested that she speak with McCoy.[57] Newton told him that Nix "was not capable of being in [the Provost] position".[58] Newton also told Wade that she would like to be appointed to a position with college-wide responsibilities.[59]

After the Hamilton campus became a part of Bevill, Wade appointed Newton to the position of Director of Student Services, reporting to a male, Dr. Devin Stevenson ["Stevenson"], whom he named as Dean of Students for the entire Bevill institution (two campuses). Wade decided that Newton would report to Stevenson and to Nix, the provost for the Hamilton campus.[60] Newton told Wade that she regarded her new appointment as a demotion and that she should be called a "Dean" rather than a "Director" since she was paid at the B pay level. Newton subsequently reported to the Hamilton campus as "Dean of Student Services" with the previously announced chain of command.[61]

### 4. *Threatt's and Davis' Claims*

Dr. Perry Ward ["Ward"], president of Lawson since 1987,[62] has the authority to hire and fire employees at the college. As

49. *Id.,* p. 142.

50. TT, 8/5/94, pp. 217–218, 225, 228–229.

51. *Id.,* pp. 218, 225. When he was appointed to Vice–President, Dr. Meadows' salary was increased to $74,550. TT, 7/29/94, p. 160.

52. TT, 7/29/94, pp. 109–110.

53. *Id.,* pp. 114–112.

54. *Id.,* pp. 114–116.

55. *Id.,* pp. 134, 153–154.

56. *Id.,* pp. 136, 155. Dr. Meadows indicated in his 1 April 1993 memorandum to Wade that "[a]ll agree that Dr. James Wade would be the most qualified and best suited to handle day-to-day operations of the Walker Campus. DX 7, p. 17. James Wade had a doctorate in higher education administration and approximately 24 years of higher education experience. TT,

7/29/94, p. 137. When Dr. Meadows was appointed provost at Walker State, there were five male administrators on the B pay level and no females." *Id.,* p. 139.

57. By the time that Newton returned to speak with McCoy, however, he told her that he had already decided to appoint Burcham as interim provost. TT, 7/5/94, p. 78.

58. TT, 8/5/94, pp. 44, 57–58, 219.

59. *Id.,* p. 56.

60. TT, 7/5/94, pp. 81–83.

61. When Newton arrived at the campus, she did not have an office for three weeks, and she did not get secretarial support for two months. *Id.,* p. 85.

62. TT, 7/25/94, p. 51.

long as he acts within Lawson's Personnel Policy and Procedures Manual, he may do so without seeking approval from the Chancellor.[63]

Upon arriving at Lawson, Ward learned of the school's dismal financial condition. He described Lawson as "virtually bankrupt" and as "very close to closing." [64] He also felt the need to make some organizational changes.[65] At that time, the school's admissions, records and financial aid activities were handled by one department which was headed by James Edwards ["Edwards"].[66]

Edwards' title was Director of Financial Aid, Admissions and Records, and he was on the C–1 salary scale.[67] In 1991, Edwards retired, and Ward divided the department previously run by Edwards into two distinct departments. Ward testified that he evaluated the department and determined that "it was not the best organizational format to have [the] two departments together, because they were separate and distinct functions." [68] Ward also relied on a document from Southern Association of Colleges and Schools in determining that admissions and financial aid needed to be separate departments.[69]

After deciding to place the two positions on the C–3 pay level, Ward sought candidates for the department head positions by advertising the openings in the local newspapers as "coordinators" and by circulating the announcements to other two year and four year institutions.[70] He stated that there was no Board policy or state law requiring him to fill a position competitively.[71] He considered the school's financial condition and determined that the C–3 salary would be "competitive" and "would attract qualified individuals." [72]

Sheryl B. Threatt is currently the Coordinator of Financial Aid at Lawson and has been employed there for 23 years.[73] She previously served as a Financial Aid Assistant for 11 years under Edwards, who was Director of Financial Aid.[74] She was appointed to the position of Coordinator of Financial Aid effective 1 November 1991, and assigned to the C–3–1 pay level at an annual salary of approximately $39,000.[75] Threatt obtained an associate's degree and a bachelor's degree while working at Lawson.

In 1984 or 1985, the college's financial aid and admissions functions were combined under Edwards, and three other employees were added to Edwards' staff (an assistant registrar, a data entry clerk, and one other assistant).[76] When Threatt became Coordinator of Financial Aid, although there were four employees who were physically located in her department, she did not have assistance. One of them apparently assisted Threatt with record keeping. Another is a computer specialist, one other is the Job Training Partnership Act manager; and the remaining employee is involved with recruit-

**63.** *Id.,* p. 51.

**64.** TT, 8/18/94, p. 10.

**65.** *Id,,* pp. 14–15.

**66.** TT, 7/25/94, pp. 56–57; 8/18/94, p. 23.

**67.** TT, 7/25/94, p. 56.

**68.** *Id.,* p. 58.

**69.** *Id.,* pp. 19–20; DX 126, p. 38, 6.1.6.

**70.** *Id.,* p. 59; 8/18/94, p. 27.

**71.** TT, 8/18/94, p. 111.

**72.** *Id.,* p. 41.

**73.** TT, 7/27/94, p. 155.

**74.** *Id.,* pp. 159–162.

**75.** *Id.,* pp. 200–203, 179. See DTX–6 for letter of appointment. Threatt was interviewed by Lawson president Perry Ward without advance notice at a conference in Mobile. Her superior advised her at 5:00 p.m. on the evening before the interview that she should "prepare to have breakfast with Dr. Ward ... at eight o-clock the next morning". Threatt did not have a resume at the interview, and no salary range was discussed. *Id.,* p. 170. Edwards, according to Threatt, was paid an annual salary of approximately $54,000 when he retired. According to the salary schedule in effect during the 1993–1994 year, the maximum annual salary for employees on the C–3 pay level was $48,291.

**76** *Id., p. 161.*

ment.[77] In fact, when Threatt was Edwards' assistant, she performed all of the duties that she presently performs "except for the reports and signing the reports".[78] Threatt does not serve on the administrative council.[79] When Threatt was appointed Coordinator of Financial Aid, her salary was $34,864; her salary at the time of trial was $39,363.[80] She stated that it would take another 15 years for her to reach the top salary on the C–1 pay level.

Myra P. Davis ["Davis"], who had been employed at Lawson for 20 years, was Coordinator of Admissions and Records at Lawson. Davis received a bachelor's degree in business administration in 1982.[81] She became Assistant Director of Admissions in 1981; her first supervisor, a male who served as Director of Admissions, was replaced in 1985 by another male who was given the same title.[82] Both males were placed on the C–1 pay level.[83]

When Davis' first supervisor left office, the job was not announced; the second director was merely moved into the position.[84] When he left office, however, the position was announced. Davis applied and was appointed as Coordinator of Admissions effective 1 November 1991, and assigned to the C–3–1 pay level.[85] The job description for Coordinator of Admissions did not accurately and completely reflect Davis' duties, but the job description for Director of Admissions was an accurate fair reflection of her duties.[86]

Although Davis performs all of the duties performed by her predecessors, after she assumed the Coordinator position, she did not have any clerical assistance or other employees in her office. In fact, she continued to perform clerical duties, including opening mail and typing, in addition to the administrative duties of the position.[87]

## III. DISCUSSION

### A. *Disparate Impact Analysis*

■ The Supreme Court first announced the disparate impact theory in *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). The Supreme Court held in *Griggs* that when a plaintiff in a Title VII case establishes that an employer maintains a racially neutral employment practice which adversely affects black employees at a substantially higher rate than whites similarly situated, the burden then shifts to the employer to justify the practice as being "related to job performance." *Griggs*, 401 U.S. at 431, 91 S.Ct. at 853.

■ "To succeed on a disparate impact theory of liability, a plaintiff must show that a policy or practice that appears neutral on its face, in fact, has a disparate impact or effect on a protected class." *LaFleur v. Wallace State Community College*, 955

---

77. That person, Charles McFarland ["McFarland"] was hired by Ward in August, 1991, without any input from Threatt. His position was not advertised, and he was paid from Threatt's budget until the first part of 1993. *Id.*, pp. 177–178.

78. *Id.*, pp. 163–165. See DTX–8 for Threatt's job description.

79. *Id.*, p. 166. The administrative council is a college advisory body which, in consultation with the President (Dr. Ward), sets college policy, formulates the budget, and makes recommendations for allocation of institutional funds among the various divisions and departments.

80. *Id.*, p. 223.

81. *Id.*

82. TT, 7/27/94, p. 5. The first supervisor, Reginald Walton, was on the C–1 pay level. *Id.*, p. 8. In addition to Davis as his assistant, he had two other full-time employees (an Assistant Registrar and a data entry specialist) and one part-time employee working under him. *Id.*, p. 10.

83. TT, 7/27/94, p. 121.

84. *Id.*

85. *Id.*, pp. 14–15. See Davis/Threatt Exhibits 4, 6 [hereinafter "DTX"]. See also DTX–2 for letter of appointment.

86. *Id.*, pp. 19, 22. See DTX–23 at p. 53. The evidence also reflected that two black females and one black male had been in charge of the Admissions unit or department before Davis. Davis did not know the title of one of them (Majorie Lawson), but the other two, James Smith and Ruth Mathews, were Directors. *Id.*, p. 100–102. Ward was not at Lawson when Mathews worked there.

87. *Id.*, p. 19.

F.Supp. 1406, 1417 fn. 14 (M.D.Ala.1996) (*citing Teamsters v. United States*, 431 U.S. 324, 335–36 n. 15, 97 S.Ct. 1843, 1854–55 n. 15, 52 L.Ed.2d 396 (1977)). *See also Young v. Montgomery County Board of Education*, 922 F.Supp. 544, 549 (M.D.Ala.1996) (Albritton, J.) (*citing Georgia State Conference*, 775 F.2d at 1417).

"If the plaintiff makes such a showing, the burden shifts to the defendant to prove a substantial legitimate justification for the practice." *Young, supra* (citation omitted). "Should the defendant prove a valid justification, the plaintiff may still prevail by proffering an equally effective alternative practice which results in less [racial or gender] disproportionality or by presenting evidence that the legitimate practice is a pretext for discrimination." *Young, supra*.

■ On 11 August 1995 (Doc. # 454), this court approved a Partial Consent Decree applicable to the class claims asserted by Dr. Connie Johnson, Newton, Davis, and Threatt.[88] The court entered a previous order certifying the class of females.[89] In both orders, this court acknowledged the evidence presented by the plaintiffs regarding females as a class. It also made a number of findings which are pertinent to disparate impact analysis and thus fully applicable here.

At that time, there were approximately 860 women employed in the postsecondary system, 250 of whom were employed as presidents, deans, administrative directors, or lower level supervisors:

– The "vast majority" of the college presidents have been white males who have exercised "unbridled discretion" in the hiring and promotion of personnel.

– Vacancies at many institutions are not advertised, are left open for extended periods of time, and are filled on a purely subjective basis without reliance on any objective minimum qualifications.

– Women are significantly underrepresented among the presidents and other high-level faculty and staff administrators.[90]

In addition to the evidence and findings already made by this court, the plaintiffs presented ample –and undisputed– expert testimony regarding the fate of women in Alabama's postsecondary system. Dr. Mary Guy ["Guy"], testified as an expert for plaintiff Newton[91] and Dr. Beverly Sheftall ["Sheftall"] testified for Davis and Threatt.

Guy's statement, admitted into evidence as PX–37, stated the following opinion:

There is a long-established pattern of entrenched discrimination against women in Alabama's Post–Secondary system, where women are systematically assigned to less powerful positions and less important policymaking positions than men are. Furthermore, gender stereotypes of long standing are perpetuated in hiring and promotion practices. This is manifested by the disproportionately few women who hold key decision-making posts in the System's institutions.[92]

Guy, who is Chair of the Political Science Department at the University of Alabama at

---

88. In its introduction, the decree declared: "This partial consent decree deals only with the claims asserted by JOHNSON, NEWTON, THREATT, and DAVIS and not those asserted by [black class representative Humphrey] SHUFORD. However, this partial consent decree shall be read in conjunction with and construed contemporaneously with the partial consent decree entered in this matter on March 15, 1994 regarding the claims raised by SHUFORD."

89. This order was entered on 10/22/94 after the trial of these individual claims.

90. Gainous testified about the several females who hold significant positions within the central offices of the Board and the postsecondary system, including Debbie Dahl, who heads the department's Fiscal Division; Pebblin Warren, the Assistant Director for the Department of Instructional Student Affairs; Renee Culverhouse, the Director of the Legal and Personnel Division; and Brenda Kelly, the Director of the Data Management and Analysis Division. None of these women, however, has any authority to appoint faculty or staff at the postsecondary institutions.

91. Davis' and Threatt's counsel urged the court, without objections from the defendants, to consider Guy's testimony on their clients' behalf (TT, 7/5/94, p. 143), and the court has done so.

92. Guy also discussed *Women and Men of the States,* a book compiled from empirical data collected in Alabama and five other states. Guy wrote and edited chapters in the book.

Birmingham, stated that almost all of her work is based on "women working in state agencies, McCoy agencies, governmental agencies, and not-for-profit agencies".[93] According to Guy, although a high proportion of the state and local workforce in Alabama consists of females, women occupy the lower ranks, while men occupy the higher ranks.

When women are promoted, they are placed in positions that restrict their discretion.[94] In Alabama, the pay levels in the postsecondary system reflect a "caste system". Newton's experience, according to Guy, reflects a "glass ceiling" – "trap door", *i.e.*, as Newton moved up the ladder, the top level positions were not available to her. It also reflects that women in administrative positions "will handle less powerful titles".[95]

Guy likened the distribution of women among the system's pay levels to "a picture of a cast [sic] system".[96] The evidence clearly established that the number of women increased as the pay levels descended: A–5 women; B, C–1, and C–2 –"a few more"; C–3 –more than 50%; D –46%; E (clerical and support positions)–"predominantly women".[97]

Guy also addressed the matter of titles assigned to women:

> Women that are typically in administrative positions will handle [sic] less powerful titles. Where—as a man would have been hired and called a director, the woman would get hired and called a coordinator [referring to Newton's entry level position].

Sheftall, a professor of English and Women's Studies at Spelman College, testified as an expert in American Studies, particularly African American and women's history.[98]

She testified that "southern colleges, whether they be public institutions or private institutions, tend to privilege ... males, and they tend to discriminate against women and African Americans".[99] Moreover, "Black women experience the 'double jeopardy' of racism and sexism in the workplace, including as administrators in postsecondary institutions, because of their simultaneous racial and gender identity." [DTX–1] She described the treatment of Davis and Threatt as "systemic discrimination." [100]

The order approving the consent decree on the female class claims also embraced the evidence of historical discrimination against women in Alabama and in its educational system. The court, adopting the expert opinion of Robert J. Norrell, found that women were at one time "excluded from leadership roles and simply were not considered for high administrative positions":

> There is a long-established pattern of entrenched discrimination against women in Alabama's Post–Secondary system, where women were systematically assigned to less powerful positions and less important policymaking positions than men are.

Plaintiffs also relied upon a statement from Dr. Guy in their quest for approval of the proposed consent decree. In her statement, presented by plaintiffs, she stated that:

> ... gender stereotypes of long standing are perpetuated in hiring and promotion practices ... manifested by the disproportionately few women who hold key decision-making posts in the System's institutions.

Guy further found that from 1965 to 1990 those women who obtained high level administrative jobs [in the postsecondary system]

93. *Id.*, p. 136.

94. *Id.*, p. 137.

95. TT, 7/5/94, pp. 139–142.

96. *Id.*, p. 140.

97. The defendants did not cross-examine Guy, reserving instead the right to take her deposition (by agreement of the parties) "at a later time". Plaintiffs counsel opined that perhaps "the deposition will obviate the need for any additional cross-examination" [TT, 7/5/94, p. 142]. Appar-

ently it did. In any case, defendants did not present any evidence from experts or lay witnesses which contradicted Guy's testimony.

98. See TT, 7/26/94, p. 11 et seq. See DTX–1 for Sheftall's vitae and her statement.

99. *Id.*, p. 13. Sheftall has done research and written articles on the subject and has taught women's studies at Spelman College and Emory University. She is also the Director of Spelman's Women's Research & Resource Center.

100. TT, 7/26/94, p. 25.

were concentrated in a small number of positions, while men occupied many positions. The positions that women generally held lacked much discretionary authority, which in turn prevented them from gaining the broad administrative experience that is typically thought necessary for advancement.

■ The plaintiffs did not present any formal statistical evidence for consideration by the court.[101] However, this court analyzed statistical evidence of defendants' discrimination against women in the order approving the consent decree on the female class claims. Accordingly, the undersigned adopts that analysis and the conclusion that, based thereon, the statistical evidence available to this court is substantial evidence of past discrimination against women in the relevant economic sphere.[102]

■ Based upon the foregoing evidence, the court concludes that the plaintiffs have met their burden of demonstrating, by a preponderance of the evidence, that the defendants' facially neutral selection procedures have had a disparate impact or effect upon females in general and upon black females in particular. The court further concludes that the plaintiffs have shown a pattern and practice of sex discrimination and that the defendants have not proven a "substantial legitimate justification for the practice".[103]

## B. Disparate Treatment, Title IX, and Fourteenth Amendment Analysis

Two analytical frameworks are applicable to the plaintiffs' disparate treatment and Title IX claims. The first one applies to the typical isolated claim of employment discrimination against an individual by a supervisor under circumstances leading to employer liability. The second one is applicable to individual claims which arise in the context of class actions when liability for class-wide discrimination has been adjudicated or when the plaintiffs have proven an immediate past history of discrimination.

■ Because "courts have regularly applied Title VII principles" in the analysis of Title IX claims, whether the defendants have violated the Education Amendments of 1972 will be determined by traditional Title VII analysis. *Lipsett v. University of Puerto Rico*, 864 F.2d 881, 896 (1st Cir.1988) ("[T]he

**101.** This court has previously noted that "[w]hile statistics can play a significant role in employment discrimination cases, statistics are inherently slippery in nature." *Williams v. Mead Coated Board, Inc.*, 836 F.Supp. 1552, 1565 (M.D.Ala.1993) (DeMent, J.). "As the Supreme Court has stated, 'statistics are not irrefutable; they come in infinite variety and, like any other kind of evidence, they may be rebutted.'" *Williams, supra (citing International Bhd. of Teamsters v. United States*, 431 U.S. 324, 340, 97 S.Ct. 1843, 1853, 52 L.Ed.2d 396(1977)). The usefulness of statistics "depends on all of the surrounding facts and circumstances." *Williams, supra (citing Teamsters*, 431 U.S. at 340, 97 S.Ct. at 1853). In the instant case, the overwhelming evidence of past discrimination against women in society and in Alabama's post-secondary system, combined with the ample anecdotal evidence from other women, diminishes the significance of traditional statistical evidence.

**102.** This finding is buttressed by consideration of the defendants' employment infrastructure, *i.e.*, a system in which several administrators (chancellors, presidents, provosts) make personnel decisions. "Where uncoordinated and independent employment decisions are made by different persons, statistics as to [employment decisions] by the overall entity may be less significant in demonstrating bias than where a single office makes all employment decisions." *Zahorik v. Cornell University*, 729 F.2d 85, 92 (2d Cir.1984). Defendants—and their personnel manuals—make the argument that their selection procedures are coordinated, but the evidence presented to this court indicates just the opposite.

**103.** Other courts have determined that to prevail on a disparate impact claim, the plaintiff must demonstrate either: (1) that her employer uses a particular employment practice that causes a disparate impact which the employer cannot prove is job related as to the particular position and consistent with business necessity, or (2) that the employer was alerted to an viable alternative nondiscriminatory employment practice which the employer did not adopt. *Hodges v. Stone Savannah River Pulp & Paper Corp.*, 892 F.Supp. 1571, 1580 (S.D.Ga.1995) (*citing* 42 U.S.C. § 2000e–2(k)(1)(A)); *see also Griggs*, 401 U.S. at 424, 91 S.Ct. at 849 (objective employment test found to have discriminatory effect); *Dothard v. Rawlinson*, 433 U.S. 321, 331–4, 97 S.Ct. 2720, 2727–29, 53 L.Ed.2d 786 (1977) (disparate impact found for height and weight requirements for prison guards). The application of that analysis leads to the same conclusion—that the plaintiffs have been victimized by the disparate impact of defendants' employment and selection practices.

Title VII standards for proving discriminatory treatment should apply to claims arising under Title IX."); *Franklin v. Gwinnett County Pub. Schs.*, 503 U.S. 60, 74–75, 112 S.Ct. 1028, 1037, 117 L.Ed.2d 208 (1992).[104] Pursuant to those amendments, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).[105] Accordingly, the Title IX issue before the court is whether the defendants' actions "excluded [the plaintiffs] from participation in" or "denied [them] the benefits of, or ... subjected [them] to discrimination" at their respective community colleges.

 Similarly, the defendants' liability under the Fourteenth Amendment may be assessed by reference to the case law which applies Title VII to employment complaints.[106] The Fourteenth Amendment to the constitution provides in pertinent part that "... [n]o State [shall] deprive any person of life, liberty or property without due process of law...." The Fourteenth Amendment limits only governmental action and does not restrict individual or private action. *See Civil Rights Cases*, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835 (1883). The requirement of due process of law is directed at the several States and "can be violated only by conduct that may be fairly characterized as 'state action.'" *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982). The defendants do not contest that they are state actors.

 In *Cross v. State of Alabama*, 49 F.3d 1490 (11th Cir.1995), the court stated:

> In order to establish a violation of the Equal Protection Clause, appellees must prove discriminatory motive or purpose.

*Whiting v. Jackson State University*, 616 F.2d 116, 122 (5th Cir.1980). The court in *Whiting* held that "such intent should be inferred in the same manner as [the Supreme Court] said it is inferred under [42 U.S.C. § 2000e–5]." *Whiting*, 616 F.2d at 121. "When section 1983 is used as a parallel remedy for violation of section 703 of Title VII [42 U.S.C. § 2000e–2], the elements of the two causes of action are the same." *Hardin v. Stynchcomb*, 691 F.2d 1364, 1369 n. 16 (11th Cir.1982) (citing *Whiting*, 616 F.2d at 123).

*Cross, supra*, 49 F.3d at 1507–08. The *Cross* analysis is applicable to the instant case since the plaintiffs seek to use § 1983 as a "parallel remedy."

### 1. The "isolated" individual claim

Title VII provides that "[i]t shall be an unlawful employment practice for an employer ... to discriminate against any individual with respect to his ... terms, conditions, or privileges of employment, because of such individual's ... sex". 42 U.S.C.A. § 2000e–2(a) (West 1994). Title VII further provides that:

> If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice ..., the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay ..., or any other equitable relief as the court deems appropriate. 42 U.S.C.A. § 2000e–5(g)(1) (West 1994).

 In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court "es-

---

**104.** Title IX is "a strong and comprehensive measure which ... is needed if we are to provide women with solid legal protection as they seek education and training for later careers". *Cannon v. University of Chicago*, 441 U.S. 677, 704 & n. 36, 99 S.Ct. 1946, 1961 & n. 36, 60 L.Ed.2d 560 (1979) (citing 117 Cong. Rec. 39252 (1971)).

**105.** The defendants do not contest their receipt of substantial federal funding.

**106.** The plaintiffs have a constitutional right to be free from unlawful sex discrimination in public employment. *See Davis v. Passman*, 442 U.S. 228, 235, 99 S.Ct. 2264, 2271, 60 L.Ed.2d 846 (1979). For reasons explained *infra*, however, this analysis is not applicable to the Fourteenth Amendment claims asserted by Davis and Threatt.

tablished an allocation of the burden of production and an order for the presentation of proof in Title VII discriminatory-treatment cases". *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 2746, 125 L.Ed.2d 407 (1993). Under the *McDonnell Douglas* approach, an employee has the initial burden of establishing a *prima facie* case of unlawful gender discrimination by a preponderance of evidence. 411 U.S. at 802, 93 S.Ct. at 1824. A "prima facie case requires evidence adequate to create an inference that an employment decision was based on a[n] [illegal] discriminatory criterion". *International Broth. of Teamsters v. United States*, 431 U.S. 324, 358, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 (1977).

■ An employee may establish a *prima facie* case of discrimination in promotion by showing (1) membership in a protected group, (2) qualification for the position sought, (3) non-selection, and (4) selection of a less or equally qualified person outside the protected group. *See Blistein v. St. John's College*, 74 F.3d 1459, 1470 (4th Cir.1996) (reduction in force case); *Seman v. Coplay Cement Co.*, 26 F.3d 428, 432 (3rd Cir.1994); *LeBlanc v. Great American Ins. Co.*, 6 F.3d 836, 842 (1st Cir.1993), *cert denied*, 511 U.S. 1018, 114 S.Ct. 1398, 128 L.Ed.2d 72 (1994).

■ If the employee establishes a *prima facie* case, the burden then shifts to the employer to rebut the presumption by producing sufficient evidence to raise a genuine issue of fact as to whether the employer discriminated against the employee. This may be done by the employer's articulation of a legitimate, non-discriminatory reason for the employment decision, which is clear, reasonably specific and worthy of credence. In the isolated individual case, the employer has a burden of production, not of persuasion, and thus does not have to persuade a court

that it was actually motivated by the reason advanced. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253–55, 258, 101 S.Ct. 1089, 1093–94, 1096, 67 L.Ed.2d 207 (1981). "If the trier of fact finds that the elements of the prima facie case are supported by a preponderance of the evidence and the employer remains silent, the court must enter judgment for the plaintiff." *O'Connor v. Consolidated Coin Caterers Corp.*, —— U.S. ——, ——, 116 S.Ct. 1307, 1309, 134 L.Ed.2d 433 (1996).

■ Once the employer satisfies this burden of production, the employee then has the burden of persuading the court that the profferred reason for the employment decision is a pretext for discrimination. The employee may satisfy this burden either directly by persuading the court that a discriminatory reason more than likely motivated the employer or indirectly by persuading the court that the proffered reason for the employment decision is not worthy of belief.[107] By so persuading the court, the employee satisfies her ultimate burden of demonstrating by a preponderance of the evidence that she has been the victim of unlawful discrimination. *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095.

### 2. The individual claimant in a class action

■ If an individual plaintiff proves "an immediate past history of racial discrimination", that "alone can be sufficient to shift to the [defendant] the burden of justifying its employment decisions by clear and convincing evidence". *Harris v. Birmingham Board of Education*, 712 F.2d 1377, 1383 (11th Cir.1983).[108] The Eleventh Circuit made a similar finding in *Cox v. American*

---

**107.** Mere disbelief of the employer's proffered reason does not "compel" a finding of discrimination. *St. Mary's Honor Center*, 509 U.S. at 510–11, 113 S.Ct. at 2749. In other words, the *McDonnell Douglas* approach should not be used by the court as a "substitute" for reaching the ultimate issue of whether the employee has, in fact, been a victim of discrimination. *Moore v. Alabama State University*, 864 F.2d 103, 105 (11th Cir.1989).

**108.** In *Harris*, black plaintiffs who were or had been coaches with the city board of education brought a Title VII employment discrimination suit. The plaintiffs claimed that the board had discriminated against them by hiring them to head coach and assistant coach positions only in black schools. The record indicated that the board had "an immediate past history of racial discrimination" and that it was "still operating under ... desegregation orders." *Id.* at 1383.

*Cast Iron Pipe Co.,* 784 F.2d 1546, 1559 (11th Cir.1986), declaring:

> In a pattern and practice case, if the plaintiff can establish "that [sex] discrimination was the company's standard operating procedure," see *Teamsters,* 431 U.S. at 336, 97 S.Ct. at 1855, the burden shifts to the employer to prove that the plaintiff was not, in fact, the victim of discrimination. *Id.* at 359, 97 S.Ct. at 1866. See also *Franks v. Bowman Transportation Co.,* 424 U.S. 747, 772, 96 S.Ct. 1251, 1268, 47 L.Ed.2d 444 (1976). In other words, **once a pattern and practice of discrimination is established, a rebuttable presumption that plaintiff was discriminated against because of her sex and is entitled to recovery obtains. The employer may overcome this presumption only with clear and convincing evidence that job decisions made when the discriminatory policy was in force were not made in pursuit of that policy.** See *Teamsters,* 431 U.S. at 362, 97 S.Ct. at 1868. We are conscious that *Teamsters* and *Franks* both involved large classes rather than individual plaintiffs. But the plaintiffs here are not, as in *McDonnell Douglas,* simply "individual complainant[s] seeking to prove one instance of unlawful discrimination." *Id.* at 358 n. 44, 97 S.Ct. at 1866 n. 44. **Once the trial court found that ACIPCO in fact had a policy of reserving plant clerical jobs for men, these individuals were in substantially the same position as the *Teamsters* and *Franks* plaintiffs—that is, they had proven that sex discrimination "was the company's standard operating procedure," and they were entitled to the presumption that the complained-of employment practices violated Title VII.**

*Cox, supra,* 784 F.2d at 1559 [emphasis added].[109]

109. *See also Bazemore v. Friday,* 751 F.2d 662, 675 (4th Cir.1984), *cert. granted,* 474 U.S. 978, 106 S.Ct. 379, 88 L.Ed.2d 333, *aff'd. in part, vacated in part by,* 478 U.S. 385, 106 S.Ct. 3000, 92 L.Ed.2d 315, where the court, also citing *International Broth. of Teamsters v. United States,* 431 U.S. 324, 359, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 (1977), found that the "district court properly placed the burden of proof on the plain-

tiffs to prove their individual claims." The court noted that "if the pattern and practice claims had been successful, then [the] plaintiffs, being in the class discriminated against, would have had the benefit of a presumption that they had been victims of the class discrimination, and the burden of proof would have been shifted to the defendants to prove that such claimants should not recover."

Thus, under the rationale employed in *Cox* and *Harris,* since this court has already determined that there is an immediate past history of sex discrimination in the Alabama Postsecondary System, the individual plaintiffs are arguably entitled to a rebuttable presumption of discrimination, thereby subjecting the defendants to the heightened burden of justfying their employment decisions by clear and convincing evidence. This means that the Board will have a heightened standard with which to comply.

### 3. Defendants' justifications/pretext

Under either of the analytical frameworks recited herein, the court reaches the same conclusions: that the defendants' employment decisions with respect to Newton, Davis, and Threatt violated their rights under Title VII and Title IX as well as Newton's constitutional rights under the Fourteenth Amendment.

Newton claims that she was discriminated against when (1) she was removed from her position as Dean of Instruction and Student Services at Northwest Community College in early May, 1993; (2) Burcham was appointed to the position of interim provost; (3) Stephenson was appointed Dean of Students at Bevill; (4) Nix was appointed provost of Hamilton; (5) Parker was appointed vice-president of Northwest Shoals; (5) Meadows was appointed vice-president at Bevill; and (7) Wade was appointed provost at Walker. These selections were made between February and September, 1993.

Threatt claims that she was discriminated against when she was named Coordinator of Financial Aid at Lawson instead of Director. Davis claims that she was discriminated against when she was appointed Coordinator of Admissions at Lawson instead of Director. In each case, males, including Billy Irving, Alfred Evans, and James Edwards, had

served as Director of Admissions and Financial Aid. Both appointments occurred on 1 November 1991.

### a. Newton

McCoy and Wade at varying points during their testimony offered the following explanations for their actions: (1) Newton lacked sufficient administrative experience when compared to the males who were appointed; (2) some or all of the males had participated in their communities while Newton did not have much involvement in the community; (3) Newton was not strictly under McCoy's supervision after the merger; and (4) selection decisions were made before Newton expressed an interest.

For several reasons, it is difficult to evaluate the validity of defendants' explanations. First, none of the positions was advertised, contrary to system and institutional policy that such positions be advertised. The procedure requires that applicants' packages be reviewed by screening or selection committees and that recommendations be made to the presidents. None of those procedures occurred. Second, the evidence indicates that rank preselection occurred and that Newton and others –including the appointees (*e.g.*, Clyde Nix)– were unaware of the impending appointments until they were publicly announced. Third, several of the positions in question, including Burcham's interim provost position, Nix's provost position, and Wade's provost position—had no incumbents and were "created" simultaneously with the challenged promotions.

 The plaintiff has proven a *prima facie* case. The court also finds that the defendants have articulated legitimate, nondiscriminatory reasons for their selection decisions. However, for the reasons which follow, the court further finds that those reasons were pretextual.

McCoy and Wade never questioned Newton's credentials or her ability to perform in any of the positions. In fact, McCoy compli-

mented Newton in a 25 January 1994 deposition, from which pertinent testimony was read into evidence at the trial. McCoy stated in his deposition that "Dr. Newton was a good employee. Very capable". He also said: "I never had any criticism of Dr. Newton". Thus, except for the need to re-organize the two campuses and the several community colleges, no reason was given for removing Newton from her position as Dean of Students for two campuses and "demoting" her to Dean of Student Services on one campus. Moreover, the reorganization was not the reason for any other administrator's demotion, especially those males who received promotions during the same period.

The Burcham appointment was a maze of subjectivity, but McCoy denies that gender played a role in his decision not to select Newton for the position of interim provost. McCoy stated that he did not place Newton in the provost position because she was not his employee at the time of her appointment to the Hamilton campus.[110] Burcham, according to McCoy, had more experience than Newton with the PC faculty and with the community. He was a longtime employee who had earned the respect of the students, the faculty and the community,[111] and McCoy also considered the fact that Burcham had served as a division chairperson and was currently the President of the Faculty Association.

Before he was appointed interim provost, Burcham was on the D pay level because he was an instructor, his salary was not immediately increased, since the school was having financial problems. Five months later, in September, 1993, McCoy recommended, and Gainous approved, Burcham's placement on the B pay level.[112] Newton had been on the B pay level for several years by that time.

McCoy further stated that, unlike Burcham, Newton had very limited experience in the instructional area.[113] On cross-examination, however, McCoy admitted that he was unfamiliar at that time with Newton's credentials, that he did not know how long

---

110. TT, 7/6/94, p. 119.

111. TT, 9/22/94, pp. 156–157.

112. TT, 8/6/94, pp. 125, 206; 9/22/94, pp. 160–161

113. TT, 9/22/94, pp. 183–184.

Newton had worked at PC, and that he did not recall speaking to her about her community involvement.[114]

The facts indicate that when Newton spoke with McCoy about an appointment to the provost position at Northwest—PC, he told her that he had already decided on Burcham. On the subject of academic training, McCoy said that he was "not as worried much about credentials" when he selected Burcham. It is significant, though, that although McCoy attempted to credit Burcham's experience as a Division Chair, Burcham was fired as Division Chair in 1977.[115]

Finally, McCoy said that although he thought that Newton had the credentials to fill the position and that she was able, he believed that "it was in the best interest to [her] and to the institution to put Burcham in the position." Plaintiffs presented undisputed evidence of Newton's community activity through testimony and through exhibits.[116]

Judy Young, Director of the Marion County Department of Human Resources, testified that Newton is regarded in the professional community to be "extremely organized", "goal-oriented", "friendly", and "a good communicator".[117] Young also testified that she thought that Newton was "an effective representative" for Bevill State.

Gerald Collins, a former supervisor of Newton's, had no knowledge of Newton's professional activities as an administrator at Northwest Alabama, but he served with her on a business advisory board for Northwest (a committee which oversees the college's school of business). He too believed that Newton was a "good representative for the school."[118]

Regarding Nix' appointment as provost at Hamilton, Wade stated that he had already decided to promote Nix as his reason for not promoting Newton when she spoke with him about the position on 27 April 1993.[119] The pretext of Wade's reason can be found in Nix' own testimony: Nix said that he was not aware of his promotion until the summer of 1993 and that he was not sure of it until September, 1993.[120] Newton's request preceded Nix' assignment or functioning in the provost position.

Parker knew of no reason why Newton was not qualified to hold an administrative position.[121] The evidence revealed that Parker was selected for Dean of Instruction in 1988 after the Chair of the screening committee informed McCoy that Parker was not qualified. Newton, by contrast, had served well in the position of Dean of Students and was in fact serving in that position when McCoy was assigned to Northwest Alabama. The evidence indicates that his appointment as Dean of Students and as Vice-President of Administration and Instruction at Northwest Shoals was a preparatory step for his later promotion. When Burcham retired 14 months after his appointment in April, 1993, his provost duties were assigned to Parker,[122] and as was the case with all previous promotions, there is no evidence that Newton or any other female was ever considered.

In September, 1993, Wade was promoted to provost at Bevill (Walker campus) from the position of Assistant Dean.[123] The record reflects that Newton's academic credentials and administrative experience were well beyond Wade's, however.

Devin Stephenson's appointment as Dean of Students at Bevill State is also suspect. When Newton, who was on the B pay level,

114. *Id.*, pp. 184–186.

115. TT, 8/3/94, pp. 125, 184.

116. McCoy talked to Northwest faculty members, students, staff members and community individuals to determine the type of person needed. Yet, he based his assertion that Newton "didn't have that much involvement in the community" on a conversation with one unnamed individual in the community. There is no evidence of the extent of Burcham's involvement in the community.

117. TT, 7/6/94, p. 94.

118. *Id.*, p. 103.

119. TT, 7/5/94, pp. 74, 76.

120. TT, 8/4/94, pp. 58, 74, 81–82.

121. TT, 8/3/94, p. 60.

122. TT, 7/6/94, p. 129.

123. TT, 8/4/94, p. 95.

was transferred to Hamilton in May, 1993, Wade directed her to report to Stephenson, who was on the C–1 pay level. Shortly thereafter, Stephenson was placed on the B pay level as Dean of Students. Newton has an earned doctorate degree while Stephenson does not,[124] and Newton had previously served as a Dean of Students.

Gainous' testimony regarding the credentials and experience necessary to be a Dean of Instruction is evidence of pretext in at least two of the selections. Gainous stated that he imparted the following requirements "to institutions as advice":

> [T]he Dean of Instruction ought to have a Doctorate, ought to have the terminal degree. It simply puts that position, that individual, in the appropriate line of respect with other individuals. I'd say the Dean of Students—it would be good if they had the Ph.D. or Doctorate, but not as necessary.

Newton was advised that she could not be a member of the administrative council at Hamilton because her functions were not college-wide, in contrast to Stephenson, who, because he represents student services for the entire college, is a member of the Council.[125] Dr. Meadows conceded, however, that James Raines, a male who served as Director of Administrative Services for the Hamilton campus only, is a member of the Administrative Council.[126]

Almost simultaneously with Parker's and James Wade's appointments, Meadows was appointed Vice–President at Bevill State. Meadows holds a doctor of education while Newton holds the more academically prestigious doctor of philosophy in higher education.

All of the evidence points clearly to the conclusion that Newton was not considered for any of these appointments. She was, instead, bounced from one campus to the other and was never allowed to use her full administrative experience and academic credentials to advance the mission of the institutions or to advance her career.

Finally, the evidence supports a finding that McCoy harbored some animus toward Newton. Burcham testified that at a 1 February 1993 meeting with employees at Northwest Alabama, McCoy announced that if Newton did not work out as the Dean of Instruction and Student Services, she would be removed from that position.[127] He gave no such warning regarding Burcham or any other administrator. When Newton complained to McCoy about her demotion, she told him that, prior to coming to the two-year system, she "had not had any problems in advancing", but that now she "had to fight for everything" that she got. McCoy had previously told Newton that he did not take well to threats, and that when he was "backed into a corner, [he] only [got] meaner".[128]

The number of positions under consideration does not diminish the court's finding that the reasons were pretextual, because (1) they were made by the same two male administrators; (2) the selections were non-competitive; (3) the reasons proffered for Newton's non-selection and the appointees' selection were subjective and inconsistent (based alternatively on credentials, experience, service in the community, previous similar service, faculty and staff recommendations); (4) several of the positions were created for the initial male appointee; and (5) vacancies persisted –or the position was abolished– after the first male appointee departed the position.

#### b Threatt and Davis

Lawson's President, Perry Ward, testified that he advertised the head of Admissions and Financial Aid positions as "Coordinator" positions instead of "Director" positions, because once he separated the original depart-

**124.** TT, 7/5/94, p. 82.

**125.** TT, 7/29/94, pp. 148, 152.

**126.** *Id,,* p. 151. Meadows also acknowledged that in January or February, 1994, he asked Newton to hang signs reading "out of commission" on the door of the bathroom after he learned that the campus had no running water. *Id.,* p. 159.

**127.** TT, 9/22/94, pp. 104, 117–118.

**128.** TT 7/5/94, pp. 80–81.

ment into two, he felt that Director status was no longer warranted for the head positions given their diminished responsibility.[129] He further stated that Threatt and Davis are performing the functions previously performed by Edwards.[130]

In addition, Threatt and Davis were not allowed to negotiate higher salaries when they became coordinators in 1991, although he believed that the 1991 salary schedule provided for negotiation between the employee and the President.[131] Neither Threatt nor Davis attempted to negotiate a higher salary,[132] and the salaries of the coordinator positions was placed in the job announcements.[133]

■ The court concludes that Ward, on behalf of the defendants has offered legitimate non-discriminatory reasons for the actions taken against Threatt and Davis. Those reasons, however, are undermined by the fact that, considered against the backdrop of the evidence, they lack credibility. The court recognizes, however, that mere lack of credibility is insufficient to prove pretext and thus examines the reasons further.

■ Men who previously held the separate titles were nevertheless called Directors, and Lawson's own manuals provide for Directors, not Coordinators, over the plaintiffs' staff functions. Through its presidents, Lawson has historically accorded Director status at the C–1 pay level to male predecessors who headed the admissions office and the financial aid office.[134] The defendants have argued that because Edwards' former position of Director of Admissions and Financial Aid was divided into two functions and

assigned to Threatt and Davis, they should be called coordinators rather than directors. However, the record reveals that when Walton and other men previously performed the same separate functions, they were called "Directors", not "Coordinators." [135]

Ward offered no explanation for plaintiffs' representation that they have no personnel assistance similar to their predecessors, that they do not serve on the administrative council,[136] that they continue to perform clerical duties that were performed by others for their male predecessors, or that the salary range included on the announcements for their coordinator positions was substantially less than the salary range for C–3 positions reflected on the 1993–1994 salary schedule.

The evidence also reflected that Ward had extended privileges to male applicants and employees, and that the "privileges" were frequently inconsistent with postsecondary or institutional policy. For example, the vice-presidency now held by Dr. Willie Kimmons ["Kimmons"] was originally advertised as Vice–President for the College and was later advertised as an Executive Dean position.[137] During the interview process, Kimmons stated that he was uninterested in becoming Executive Dean because he had already been a dean. Ward changed the position to Vice–President and sought approval from the Chancellor to raise the salary to $65,000.[138]

Ward also admitted that he placed Jonathan Eldridge ["Eldridge"] in the Chairperson of Correctional Education position and Charles McFarland ["McFarland"] in the Book Store Manager position without first

129. TT, 7/25/94, p. 76; 8/18/94, p. 33.

130. *Id.*, pp. 77, 80, 116.

131. *Id.*, pp. 93, 95; D & T Ex. 22, p. 443.

132. TT, 8/18/94, p. 32.

133. TT, 7/25/94, p. 96.

134. TT, 7/27/94 pp. 68, 109, 122, 209; TT, 7/25/94, p. 202.

135. See DTX–35, 36, 37, and 38. Lawson's college manual lists a separate Director of Financial Aid and Director of Admissions. The college's

Personnel Policy Manual (DTX–37), promulgated in 1982, identifies a "Director of Admissions and Registrar" whose responsibilities do not include financial aid or other fiscal matters. It separately identifies a "Director of Financial Aid" whose focus was work and financial aid opportunities for current students.

136. Although Edwards, Davis' predecessor, was a member of the administrative council, Davis was not on the council, because "[c]oordinators are not on the council".

137. TT, 7/25/94, pp. 98–99.

138. *Id.*, pp. 99–100.

advertising the openings.[139] According to Ward, chairperson positions were never advertised.[140] Eldridge became the Chairperson of the Correctional Education program in 1990 or in 1991.[141]

McFarland was initially hired in September, 1991 under a three-month contract as an Admissions Consultant,[142] and placed on the E–2 salary schedule.[143] From November, 1991 to September, 1992, McFarland worked as a Financial Aid Assistant/Recruiter.[144] In September, 1992, McFarland was on the E–2–10 salary schedule.[145] During this time, McFarland reported directly to Ward, although he worked both in Threatt's and Davis' areas of responsibility (and within Davis' physical area).[146] Ward stated that McFarland reported to him with respect to his recruitment duties only because he (Ward) wanted to be active in the area of recruitment.[147]

In September, 1992, McFarland began acting in the capacity of Book Store Manager.[148] In September, 1993, McFarland was on the C–3–0 salary schedule.[149] McFarland went from the E–3 salary schedule to C–3 in a two-year period.[150] Ward acknowledged that McFarland's two-year experience as acting Book Store Manager might give him an advantage for the permanent position but that it was not a guarantee that he would receive the position.[151]

By 1994, McFarland had been acting Book Store Manager for approximately 2 years, in violation of a state rule which provides that individuals may serve in acting capacities for not more than 18 months. Ward admitted that he was aware of the rule and of McFarland's tenure in the position.[152] The school had planned to advertise the Book Store Manager position in 1994, but because 1994 was "an unusual year," McFarland remained in the position beyond the 18–month time frame.[153] Thus, at the time of trial, McFarland, a temporary employee who is not even lawfully on Lawson's payroll, was on the same pay level as Davis and Threatt.

The court concludes that, although Ward, on behalf of the defendants, has offered legitimate, non-discriminatory reasons for the actions taken against Threatt and Davis, the plaintiffs' positions and duties clearly merited Director designation at the college. Men who previously held the separate titles were Directors, and Lawson's own manuals provide for the Directors designation.

The slippery explanations offered by Ward, combined with all of the other considerations set forth herein, provide evidence of discriminatory intent, and they demonstrate that the reasons proffered are a mere pretext for discrimination.[154] Of equal persuasive value was Ward's admission that he did not consider any women for the Chairperson position to which Eldridge was appointed because of "safety reasons," since the Chairperson visits the West Jefferson Correctional

139. *Id.*, pp. 60–62.

140. *Id.*, pp. 60, 62.

141. *Id.*, p. 100.

142. *Id.*, p. 63; D & T Ex. 21.

143. *Id.*, p. 117.

144. *Id.*, pp. 63–64.

145. *Id.*, p. 118.

146. *Id.*, pp. 109–110, 113.

147. *Id.*, pp. 111–113.

148. *Id.*, pp. 64–65.

149. *Id.*, pp. 117–118.

150. *Id.*, p. 119.

151. TT, 8/18/94, p. 179.

152. TT, 7/25/94, pp. 64–65, 119.

153. *Id.*, p. 120.

154. Defendants introduced evidence which suggested that Threatt's and Davis' male predecessors had more degrees and were thus better prepared to do their jobs. However, although Evans held a doctorate and Edwards held a master's degree when they served as Directors, Billy Irving held a two-year degree, a credential which is inferior to Davis' and Threatt's bachelor's degrees. *Id.*, pp. 209–210. Both plaintiffs testified, without contradiction, that higher degrees were neither required nor necessarily useful in performing their duties.

Facility.[155] Given the number of women in America today who perform competitively and admirably in law enforcement, corrections, and other non-safe occupations, Ward's admission is a reminder that gender stereotyping still plays a role in the assignment of women to administrative positions – at least at Lawson.

### C. *Threatt's and Davis' Fourteenth Amendment [§ 1983], § 1983 and Title IX Claims*

The plaintiff's cause of action accrued on 1 November 1991 when they were appointed to their positions as coordinators at Lawson. At that time, the statute of limitations period applicable to actions brought in Alabama pursuant to 42 U.S.C. § 1983 was two years. *Owens v. Okure,* 488 U.S. 235, 109 S.Ct. 573, 102 L.Ed.2d 594 (1989). Thus, the plaintiffs had two years from the time of the alleged misconduct to file their individual § 1983 claims. Since the actions about which the plaintiff complains occurred in November, 1991, the applicable statute of limitations period expired in November, 1993, three months before the plaintiffs filed their motions to intervene on 3 February 1994.

The statute of limitations is usually a matter which may be raised as an affirmative defense, and the defendants have challenged the timeliness of the plaintiffs' § 1983 claims throughout this litigation, including an oral motion at trial and argument in their post-trial briefs. In any case, the court notes that in an action brought pursuant to § 1983, it may consider, *sua sponte,* affirmative defenses that are apparent from the face of the complaint and need not wait to see if the defense will be asserted in a defensive pleading. *Clark v. Georgia Pardons and Paroles Board,* 915 F.2d 636, 640 n. 2 (11th Cir.1990); *see also Ali v. Higgs,* 892 F.2d 438 (5th Cir.1990). Consequently, the plaintiffs' § 1983 claims are barred by the statute of limitations.

Threatt's and Davis' § 1981 claims are similarly barred. The statute of limitations for § 1981 actions is determined by applying the same state statute of limitations

for personal injury claims as is applicable in § 1983 actions. *Goodman v. Lukens Steel Co.,* 482 U.S. 656, 660–61, 107 S.Ct. 2617, 2620–21, 96 L.Ed.2d 572 (1987). For reasons already articulated, the court concludes that Threatt's and Davis' § 1981 claims are also time barred.

Like Section 1983, Title IX does not contain an explicit statute of limitations. Courts which have considered this issue have consistently held that Title IX claims are most closely analogous to state law personal injury claims. *Lillard v. Shelby County Bd. of Educ.,* 76 F.3d 716, 729 (6th Cir.1996) ("The great weight of authority, then, plainly favors applying, in this case, the Tennessee statute of limitations for personal injury claims" to the plaintiffs Title IX claims); *Egerdahl v. Hibbing Community College,* 72 F.3d 615, 618 (8th Cir.1995) (student's Title VI and Title IX claims were governed by the six-year personal injury statute of limitations); *see also Cetin v. Purdue University,* Nos. 94–3112, 95–1254, 1996 WL 453229, at *2 (7th Cir. Aug.7, 1996) ("We agree with the defendants that [the plaintiffs] Title IX claim falls outside of the limitations period, which is two years under the relevant statute of limitations, Ind.Code 34–1–2–2(1)."); *Benzo v. New York State Division of Human Rights,* No. 95–CIV–5362, 1997 WL 37961 * 6 (S.D.N.Y. Jan.31, 1997) ("Neither Title IX nor Title VI contains an express statute of limitations. Claims under both statutes therefore fall within the three-year statute of limitations applicable to personal injury causes of action in New York").

Under the rationale employed by these courts, Threatt's and Davis' Title IX claims would be barred as untimely. Their actions [motions to intervene] were filed on 3 February 1994, and consequently, any unlawful acts committed before 3 February 1992, –*i.e.,* two years before their actions were commenced – would fall beyond Alabama's two-year personal injury statute of limitations.

Neither the Eleventh Circuit nor any court within this circuit has addressed this issue. The Eleventh Circuit, however, has concluded that traditional Title VII anal-

---

**155.** TT, 7/25/94, pp. 101, 104.

ysis is equally applicable in Title IX cases. *See e.g. Davis v. Monroe County Board of Education,* 74 F.3d 1186, 1191 (11th Cir. 1996), *rehearing en banc granted, vacated by* 91 F.3d 1418 (11th Cir.1996) (Previous Eleventh Circuit opinion, cited in *Davis,* reversed on issue of applicability of Title VII principles in Title IX cases for determination of compensatory damages. *Franklin v. Gwinnett County Public Schools,* 911 F.2d 617 (11th Cir.1990), *rev'd,* 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992)).[156] This court concludes that, unlike §§ 1983 and 1981, Title IX is not governed by the states statute of limitations. This court finds no reason to treat Title IX differently from Title VII in the determination of whether Threatt and Davis should be allowed to pursue their Title IX claims.

### D. Exhaustion And Employer Liability [157]

Throughout this litigation, the defendants have argued that this court lacked jurisdiction to consider Davis' and Threatt's claims because their charges of discrimination filed with the EEOC on 31 January 1994 were not timely, *i.e.,* their charges were not filed within 180 days of the alleged act of discrimination (1 November 1991). The plaintiffs have countered that argument by contending that (1) defendants' violations were continuing, and (2) they should be permitted to piggyback their claims to Newton's claims.[158] Applicable case law permits the plaintiffs to pursue their claims in this court notwithstanding their substantially delayed filing with EEOC. For that reason, this opinion does not resolve the issue of whether the acts of discrimination were continuing.

■ Pursuant to the general rule, before instituting a Title VII action in federal district court, a private plaintiff must file an EEOC complaint against the discriminating party and receive statutory notice from the EEOC of his or her right to sue the respondent named in the charge. *Pinkard v. Pullman–Standard,* 678 F.2d 1211, 1215 (5th Cir. Unit B 1982), *cert. denied,* 459 U.S. 1105, 103 S.Ct. 729, 74 L.Ed.2d 954 (1983) *(citing, inter alia,* 42 U.S.C.A. § 2000e–5(f)(1)).

■ Threatt and Davis do not contest the allegation that they failed to exhaust their administrative remedies independently by failing to file timely charges with the EEOC. Instead, they attempt to bypass the exhaustion requirement under the single-filing rule by appending their individual claims to Dr. Newton's and Dr. Johnson's individual claims.[159]

■ The single-filing (or "piggybacking") rule provides that under some circumstances, a grievant who did not file an EEOC charge may opt into a class action by "piggybacking" onto a timely charge filed by one of

---

**156.** *See also Roth v. School Board of Collier County,* No. 96–62–CIV–FTM–17D, 1996 WL 391703 *2 (M.D.Fla. July 9, 1996) ("This court finds no reason to treat individual liability under Title IX different from that under Title VII".)

**157.** The defendants ambiguously contend that Davis' and Threatt's Title IX claims are also barred because they failed to exhaust their administrative remedies. The defendants have cited no authority in support thereof, and because of the expiration of the statute of limitations (see discussion, *supra* ), the defense is moot. The court reminds the defendants, however, that the law is directly contrary to their assertion.

In *Cannon v. University of Chicago,* 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), the Supreme Court noted that Title IX does not require a plaintiff to exhaust administrative remedies before pursuing a private cause of action in federal court. *Id.* at 707 n. 41, 99 S.Ct. at 1963 n. 41. The Court found that Title IX administrative remedies do not provide adequate relief for private persons. *Id.* at 706–08 n. 41, 99 S.Ct. at

1963 n. 41; *see also Does v. Covington County School Board of Education,* 930 F.Supp. 554, 566 (M.D.Ala.1996) (Thompson, J.) (students were not required to exhaust administrative remedies before pursuing action against board of education under Title IX). Accordingly, the court finds that the defendants' argument lacks merit.

Defendants also asserted the defenses of absolute and qualified immunity, collateral estoppel, and res judicata. These defenses are inapplicable to any of the plaintiffs' claims.

**158.** Newton's charge of discrimination, filed on 3 August 1993, was unquestionably timely.

**159.** "[T]he 180 day filing requirement is not jurisdictional and, thus, like a statute of limitations, it is subject to waiver, estoppel and equitable tolling." *Burnam v. Amoco Container Co.,* 755 F.2d 893, 894 (11th Cir.1985). Threatt and Davis do not contend that this court should apply equitable principles to toll the 180–day filing time period.

the named plaintiffs in the class action.[160] *Grayson v. K Mart Corp.*, 79 F.3d 1086, 1101 (11th Cir.1996). The Eleventh Circuit recognized in *Calloway v. Partners National Health Plans*, 986 F.2d 446 (11th Cir.1993), that the piggybacking rule is applicable to Title VII cases.

In *Calloway*, Steward, a black female, had been fired from Partners National Health Plans ("Partners") in February 1988, after which she filed an EEOC charge on February 19, 1988 alleging discrimination with respect to wages and other employment conditions. Calloway, the only other black female at Partners, resigned in 1989, after attempting unsuccessfully to negotiate a higher salary. Steward filed suit in 1989 after receiving her right to sue notice from the EEOC. Calloway unsuccessfully attempted to intervene in Steward's lawsuit, and the district court treated Calloway's claim as a separate lawsuit. After the bench trial on Calloway's case, however, the district court found Calloway's claim to be sufficiently similar to Steward's claim such that Calloway could rely on Steward's EEOC charge.

The Eleventh Circuit agreed, holding that Calloway, as an unsuccessful intervenor, could piggyback and rely on Steward's charge provided that the charge was valid and the individual claims of Calloway and Steward arose out of similar discriminatory treatment in the same time frame. Specifically, the court held that an employment discrimination plaintiff may piggyback provided that "(1) the relied upon charge [to which he is piggybacking] is not invalid, and (2) the individual claims of the filing and non-filing plaintiff [the named filing plaintiff and the piggybacking plaintiff] arise out of similar discriminatory treatment in the same time frame." *Id.* at 450.

This circuit's evolving application of the single-filing rule in the context of Title VII actions was summarized in *Calloway* as follows:

> We first invoked the "single-filing rule" in the context of a class action to permit unnamed plaintiffs to rely on the EEOC charge filed by the named plaintiff. We then extended the single-filing rule to permit intervenors who had not filed EEOC charges to rely on the charge of one of the original plaintiffs. Finally, we permitted plaintiffs in multiple-plaintiff, non-class action lawsuits to rely on the charge filed by one of their co-plaintiffs.

*Id.* at 450 (citations omitted).[161]

█ In the instant action, Newton, Threatt, and Davis are members of the class of females represented by Dr. Connie Johnson and by Newton. Moreover, the court has certified a subclass of African American females represented by Davis and Threatt themselves. Their claims certainly arise from the same practices that are challenged by Newton and that are the subject of the two consent decrees that have been previously entered by this court. Significantly, the parties themselves were the architects of both decrees. Thus, Davis and Threatt may pursue their individual Title VII claims in this court.

Liability for the Title VII and Fourteenth Amendment violations against Newton and for the Title VII violations against Davis and Threatt rests with the members of the Alabama State Board of Education and with the college presidents, in their official capacities. In *Busby v. City of Orlando*, 931 F.2d 764 (11th Cir.1991), the Eleventh Circuit held as follows:

> Individual capacity suits under Title VII are ... inappropriate. The relief granted under Title VII is against the employer, not individual employees whose actions would constitute a violation of the Act.

---

**160.** The "piggybacking rule" is synonymous with the "single filing rule," and the court will use these terms interchangeably throughout this opinion.

**161.** The Eleventh Circuit has recognized also that the charge of someone other than a named plaintiff of the class action can in some circumstances serve as the underlying "piggybacked" charge on which a putative plaintiff can piggy-back. *See e.g. Larkin v. Pullman–Standard Division, Pullman, Inc.*, 854 F.2d 1549, 1562–65(11th Cir.1988), *vacated on other grounds sub nom, Pullman–Standard, Inc. v. Swint*, 493 U.S. 929, 110 S.Ct. 316, 107 L.Ed.2d 307 (1989); *see also Wheeler v. American Home Products Corp.*, 582 F.2d 891, 897–98 (5th Cir.1977) (extending single-filing rule to intervenors).

See *Clanton v. Orleans Parish School Bd.*, 649 F.2d 1084, 1099 & n. 19 (5th Cir.1981); see also 42 U.S.C. § 2000e(b) (1988) (definition of "employer"); 42 U.S.C. § 2000e–2 (1988) (violation for "employer" to discriminate); 42 U.S.C. § 2000e–5(g) (1988) (relief for violation of § 2000e–2). **We think the proper method for a plaintiff to recover under Title VII is by suing the employer, either by naming the supervisory employees as agents of the employer or by naming the employer directly.**

*Busby, supra,* 931 F.2d at 772 [emphasis added].

More recently, in *Wallace v. City of Montgomery,* 956 F.Supp. 965, 976 (M.D.Ala.1996) (DeMent, J.), this court stated the following in an § 1983 action:

It is well established that "suits against an official in his or her official capacity are suits against the entity the individual represents." *Parker v. Williams,* 862 F.2d 1471, 1476 n. 4 (11th Cir.1989); see also *Monell v. Department of Social Services of City of New York,* 436 U.S. 658, 691 n. 55, 98 S.Ct. 2018, 2036 n. 55, 56 L.Ed.2d 611 (1978) (indicating that "official-capacity suits generally represent only another way of pleading action against an entity of which an officer is an agent"); *Welch v. Laney,* 57 F.3d 1004, 1007 (11th Cir.1995); *Farred v. Hicks,* 915 F.2d 1530, 1532 (11th Cir.1990).

*Wallace, supra,* 956 F.Supp. at 976. See also *Griswold v. Alabama Department of Industrial Relations,* 903 F.Supp. 1492, 1496–1497 (M.D.Ala.1995) (Albritton, J.).

▆▆▆▆ No relief under § 1983 is granted against the ASBE or against any of the institutions. The defendants are correct in their assertion that the Eleventh Amendment prohibits a federal court from exercising jurisdiction over a lawsuit against a state, except where the state has consented to be sued or waived its immunity, or where Congress has overridden the state's immunity.

*Puerto Rico Aqueduct and Sewer Authority v. Metcalf & Eddy, Inc.,* 506 U.S. 139, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993) (absent waiver of the Eleventh Amendment immunity, neither the state nor any agency acting under its control may be subject to suit in federal court). Since Alabama has not waived its immunity, the plaintiffs' § 1983 claims against the state of Alabama –*i.e.,* the ASBE– is barred. *See also Alabama v. Pugh,* 438 U.S. 781, 782, 98 S.Ct. 3057, 3057–58, 57 L.Ed.2d 1114 (1978).

▆▆▆▆ "It is undisputed [however] that the Eleventh Amendment does not bar [the plaintiffs'] Title VII suit." *Allen v. Alabama State Bd. of Educ.,* 816 F.2d 575, 577 (11th Cir.1987). Thus, the immunity defense does not apply to plaintiffs' Title VII claims.[162]

## IV. CONCLUSION

It is predictable that the incentives for a system-wide practice of gender discrimination may be found in the body which governs the system, in this case the Alabama State Board of Education. The evidence in this case demonstrated clearly that, as a by-product of the election campaigns and political considerations upon which board members constantly focus, the state's community colleges, junior colleges, and technical colleges are major habitats for the beneficiaries of patronage.

There is, of course, a lingering tension between personnel decisions driven by political patronage on the one hand and merit-based selections on the other hand. For that reason – and others which are particularized *supra* – personnel selections within the Alabama Postsecondary System in general, and within the maze of Northwest Alabama schools and Lawson in particular have been riddled with considerations which are not merit-based. In fact, based on the totality of the evidence before the court, it is not unreasonable to conclude that, in large measure,

**162.** "Supervisor liability occurs either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional deprivation. The causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so." *Cross, supra,* at 1508, citing *Brown v. Crawford,* 906 F.2d 667, 671 (11th Cir.1990) (citations omitted), *cert. denied,* 500 U.S. 933, 111 S.Ct. 2056, 114 L.Ed.2d 461 (1991).

appointments to administrative positions at the Northwest Alabama schools and at Lawson were designed primarily to advance the power of the appointing officials and the careers (and financial well-being) of the appointees. In contrast, advancement of the students served by the employees, the institutions, and the system appears to exist as a mere remnant of the multi-million dollar public trust managed by the defendants.

When the propensity for gender discrimination and gender stereotyping is interwoven into the fabric of a system's management, the results are the phenomena which are the subject of this lawsuit. Nowhere is the reality of political motivation seasoned with gender stereotyping more evident than in the testimony of Victor Poole ["Poole"], a 31–year veteran of the ASBE. In many ways, the sentiments [163] expressed by Poole set the stage for the decisions made by McCoy, Wade, and Ward.[164]

A sampling of Poole's testimony is instructive:

1. We started off with the idea that we would have eight schools, and we established the first two, one at Hamilton and one at Phil Campbell, **because of the — that was a geographic area in which very influential legislators lived,** one by the name of Rankin Fite, who participated greatly in the creation of the Post–Secondary system.[165]

2. The aid [referring to the location of schools in a district] got to be such a good thing, we just kept going and established 25 [schools].[166]

3. You had a lot of people in that area who felt that their **daughters and their sons** should be employed at Phil Campbell. Had a lot of people in there who felt like their **son** should be President of Phil Campbell, and, of course, the Board during that time, made some bad mistakes.[167]

4. [T]he changing role that we need to play in educating citizenry of this state, and that's changed tremendously. You have more adults, older, middle-aged people coming back to school ... **Women, they have a half a dozen children, and their husband leaves them, they got to have something to do.**[168]

5. [W]hen we got [to Phil Campbell to begin the administrative reorganization], we found that the salaries, for example, of the employees on the Phil Campbell campus were about 145 percent of the state allocation [for the entire institution].[169]

6. [T]his system started in a political mould [sic].[170]

7. I appointed [the presidents at] Shelton, Bessemer, and Fayette, and CA Fred [sic], which is not a partnership.... I was appointed the ones that I represented at the time ... We [Board members] used to do all of the appointments. And when that was changed, **I was the only dissenting vote when the change was made because I**

163. As a witness, Poole's testimony was often unresponsive to the questions asked, but just as often, it facilitated the court's understanding of (1) the considerations which drive Board decisions, (2) the inter-relationships among Board members as they make decisions regarding schools located in one member's district, and (3) the surprising personal contact between Board members and college employees. Moreover, since Poole's tenure predated the creation of the postsecondary system, the Northwest Alabama colleges in question, and the system's official pay levels, he was a remarkable historian for this case. His ability—and his willingness—to add context to the facts under consideration, based on his personal knowledge, provided "verbal best evidence" of the parties' claims and defenses.

164. Although Lawson was not in Poole's district when this case was tried in 1994, a portion of the Lawson campus was located in Poole's district in the early 1980's. TT, 8/2/94, pp. 22–23.

165. TT, 8/2/94, pp. 8, 20. The campuses at Phil Campbell and at Hamilton were the systems very first two schools.

166. *Id.*

167. *Id.,* p. 10.

168. *Id.,* p. 11.

169. *Id.,* p. 14.

170. *Id.,* p. 21.

think we ought to appoint the Presidents.[171] [All emphases added]

Poole indicated that the selection procedures in the postsecondary system had changed substantially from its beginning to the 1990's, but he readily added that, while he does not blame college presidents for selecting administrators without his input, he still prefers the old way of doing things and continues his attempt to influence such decisions.[172] Poole also stated that, in the early years, membership in the state legislature was an advantage in becoming a college president; he acknowledged that women were not in the Alabama legislature until "the late seventies". In 1994, there were "about 20" women in a state legislature of 140.[173]

Finally, as a significant representative of the defendants, Poole articulated attitudes toward women that are widespread and therefore influential in employment decision-making. When plaintiffs' counsel challenged his opinion that there were no female applicants for college presidencies until the early 1980's, Poole retorted:

Sir, my wife is a retired teacher. And you did not have women anywhere in the educational process but in the classroom. She later became a Principal, but it was long, long, after she started teaching and many, many men principals, she broke in.[174]

As an explanation for the absence of applications from women:

It'd have been kind of strange for [a woman] to have given up what they had in the classroom, where students obeyed them, discipline was good, wasn't any absences. They felt like they were doing a great job teaching.[175]

In response to the court's request for an explanation of women's exclusive placement "in the classroom", Poole provided the following explanation:

Well, the lack of initiative, one, of the women to apply; and, secondly, if they did apply, they didn't get the job.... **At that point in time, It was almost universally agreed, by women and men, that that was not the role of a woman.**[176] [emphasis supplied].

Poole was clearly one of the framers of the "Constitution" which shapes the consideration of women for administrative positions in Alabama's Postsecondary System. From the "Articles" which he forthrightly set forth at trial has arisen an unwritten statutory code enforced by college presidents to insure that its principles remain intact. That women are unsuitable for administrative positions in academia is one of the central principles of that system and of this lawsuit.

All of the plaintiffs are entitled to relief on their Title VII and Title IX claims, and Newton is entitled to relief on her Fourteenth Amendment claim. All of the plaintiffs are entitled to declaratory and injunctive relief on their Title VII claims. 42 U.S.C.A. § 2000e–5(g)(1) (West 1994).

First, they are presumptively entitled to backpay and other retroactive benefits that they would have received had they not been denied promotional opportunities. *Lengen v. Dept. of Transp.,* 903 F.2d 1464, 1468 (11th Cir.1990). Because the defendants have not overcome this presumption, the court will award the plaintiffs backpay and other benefits. The court will give the parties an opportunity to agree on the appropriate amount.

171. *Id.,* pp. 24–25. Poole stated that he had appointed five presidents, none of whom were women. He offered a presidency to one woman, Dr. Linda Wilson, who declined, because, in Poole's opinion, she did not want to move from South Alabama to Bessemer, which is located in North Alabama.

172. *Id.,* pp. 38–45. "Maybe the way we're appointing Presidents is the best way that a majority of about eight to one vote thought it was. I don't know that I could improve on it by not having—by being able to have a lot more input into it.... I'll just be perfectly honest with you

and say that I would exert any influence [in the selection of administrative personnel below the president] I thought I could get by with ... The Presidents that we have in our district now won't let me do that."

173. *Id.,* p. 52.

174. *Id.,* p. 54.

175. *Id.,* p. 57.

176. *Id.,* p. 58.

Second, as victims of gender discrimination, Newton, Davis, and Threatt are presumptively entitled to immediate instatement to the positions that they would have had at this time in the absence of discrimination. *Nord v. United States Steel Corp.*, 758 F.2d 1462, 1470 (11th Cir.1985). The court cannot determine from the current record whether such positions still exist, whether others would have to be bumped to place the plaintiffs in the positions, or whether there are comparable positions available. *See Hicks v. Dothan City Board of Educ.*, 814 F.Supp. 1044 (M.D.Ala.1993) (Thompson, J.) (discussing how a court should approach reinstatement, in particular when the position sought may already be filled). The court will therefore give the parties an opportunity to agree upon the appropriate equitable relief, including, (1) the positions to which the plaintiffs are now entitled, (2) seniority, (3) tenure status, (4) retirement, and (5) any other benefits.

Third, the court will provide both the declaratory and injunctive relief requested by the plaintiffs to assure that, in the future, Newton, Davis and Threatt will be able to work in a bias-free environment at their respective colleges.

Fourth, Newton, Davis, and Threatt are entitled to recover reasonable attorney's fees and expenses. 42 U.S.C.A. § 2000e-5(k) (West 1994). The court will give the parties an opportunity to agree upon the amount of such fees and expenses.

An appropriate judgment will be entered in accordance with this memorandum opinion.

### JUDGMENT AND INJUNCTION

In accordance with the memorandum opinion entered this date, it is the ORDER, JUDGMENT, and DECREE of the court:

(1) That judgment is entered in favor of plaintiffs Karen Newton, Myra P. Davis, and Sheryl B. Threatt and against the defendants on their Title VII and Title IX claims;

(2) That judgment is entered in favor of plaintiff Karen Newton and against the individual defendants in their official capacities on her Fourteenth Amendment and § 1983 claims;

(3) That judgment is entered in favor of the defendants and against Myra P. Davis and Sheryl B. Threatt on their Fourteenth Amendment and § 1983 claims;

(4) That it is DECLARED that the defendants failed to promote plaintiff Newton and failed to name Davis and Threatt as Directors because they are women, in violation of Title VII of the Civil Rights of Act of 1964, as amended, 42 U.S.C. § 2000e through 2000e–17, and Title IX of the Education Amendments of 1972;

(5) That it is DECLARED that the defendants failed to promote plaintiff Newton, in violation of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983;

(6) That defendant Alabama State Board of Education, its officers, agents, servants, employees, and those persons in active concert or participation with them who receive actual notice of this order, are each ENJOINED and RESTRAINED from discriminating against plaintiffs Newton, Davis, and Threatt in promotions, assignment to pay levels, and terms and conditions of employment;

(7) That plaintiff Newton be appointed to the position the she would have been entitled to occupy at the present time, but for gender discrimination, together with all backpay interest, seniority, tenure status, retirement and any other benefits to which the plaintiff is entitled;

(8) That plaintiffs Davis and Threatt be appointed to the positions that they would have been entitled to occupy at the present time, but for gender discrimination, together with all backpay, interest, seniority, tenure status, retirement and any other benefits to which the plaintiffs are entitled;

(9) That, if the parties cannot agree on the issue of the promotion of the plaintiffs, the level of their appointments and their pay levels, plaintiffs Newton, Davis and Threatt are allowed 28 days from the date of this order to file a request for the court to determine these benefits;

(10) That, if the parties cannot agree on appropriate backpay and other retroactive employment benefits, plaintiffs Newton, Davis, and Threatt are allowed 28 days from the date of this order to file a request for the court to determine these benefits;

(11) That plaintiffs Newton, Davis, and Threatt are to have and recover from the defendants named herein reasonable attorney's fees and expenses;

(12) That, if the parties cannot agree on reasonable attorney's fees and expenses, plaintiffs Newton, Davis, and Threatt are allowed 28 days from the date of this order to file a request for the court to determine such fees and expenses.

It is further ORDERED that the costs are taxed against the defendants named herein for which execution may issue.

The Clerk of the court is DIRECTED to issue a writ of injunction.