UNITED STATES of America, Plaintiff,

v.

**MATAGORDA COUNTY, TEXAS and James Mitchell, in his official capacity as Matagorda County Sheriff, Defendants.**

**Christopher Jordan, Intervenor.**

**No. Civ.A.G–01–010.**

United States District Court, S.D. Texas, Galveston Division.

Jan. 10, 2002.

William B. Fenton, Assistant U.S. Attorney, U.S. Dept. of Justice, Washington, DC, Mervyn Milton Mosbacker, Jr., Office of U.S. Attorney, Houston, TX, Allen W. Levy, Alicia Dyoni Johnson, U.S. Dept. of Justice, Employee Litigation Sec./Civil Rights Division, Washington, DC, for United States.

Lionel Mills, Everett McClain, Houston, TX, for Christopher Jordan.

William Scott Helfand, Magenheim Bateman, et al., Houston, TX, for Defendants.

### ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

KENT, District Judge.

Plaintiff United States of America and Plaintiff–Intervenor Christopher Jordan (collectively, "Plaintiffs") bring this Title VII lawsuit against Defendants Matagorda County, Texas ("Matagorda County") and James Mitchell ("Mitchell"), in his official capacity as the Matagorda County Sheriff. Now before the Court is Defendants' Motion for Summary Judgment, filed December 14, 2001. For the reasons articulated below, Defendants' Motion for Summary Judgment is hereby **GRANTED IN PART** and **DENIED IN PART.**

## I.

Christopher Jordan ("Jordan"), an African–American, began working as a sheriff's deputy-jailer for the Matagorda County Sheriff's Department ("the Department") on October 7, 1995.[1] In June 1996, Jordan's direct supervisor, Sgt. Wayne O'Brien ("O'Brien") was having trouble understanding several African–American inmates and said aloud, in front of Jordan, "I don't understand nigger lip." Upset by O'Brien's comment, Jordan complained to O'Brien's direct supervisor, Capt. Robert Dearing and consequently, Capt. Dearing orally reprimanded O'Brien. Although O'Brien stopped making such comments in the presence of Jordan, Gwen Galloway, one of Jordan's co-workers at the jail avers that she "often heard Sgt. O'Brien call Mr. Jordan, behind Mr. Jordan's back so that Mr. Jordan could not hear, things such as 'lazy nigger' and 'stupid nigger.'" In October 1996, Jordan requested and was granted a transfer to another shift, where he was no longer supervised by O'Brien.

Although O'Brien did not supervise Jordan directly over the course of the next two years, the two men encountered each other frequently due to the small size of the Department. During this time, O'Brien routinely berated Jordan and publicly stated that Jordan was "not smart enough" to work at the Department.[2] Troi Johnson, who worked in the jail with Jordan, avers that "Sgt. O'Brien's antipathy toward Mr. Jordan was so intense that it became almost a dark joke between jail employees" and that O'Brien routinely called Jordan, but not anyone else in the Department, a "picket bitch." In February 1999, O'Brien was promoted to Captain. As part of his new duties, Capt. O'Brien once again supervised Jordan. In the five weeks following O'Brien's promotion, Jordan was reprimanded on two occasions, one of which included a three-day suspension.[3]

In March 1999, Jordan filed a charge with the EEOC complaining of racism in the Department. On March 29, 1999, the EEOC sent a letter to Mitchell, notifying him of Jordan's charges. During the following two weeks, Jordan was reprimanded on two occasions and docked one day of holiday leave. Also within the two weeks after Jordan's filing of the EEOC charge, two inmates (Pete Martinez and John Silva) claimed that Jordan had illegally provided them with alcohol. After an internal investigation, which included undercover tape recording and the collection of physical evidence, Mitchell fired Jordan on April 21, 1999.[4] Jordan subsequently amended his EEOC complaint to add a claim of retaliation. Soon after, the Department referred the charges against Jor-

1. Jordan was hired by Sheriff Kilgore. On January 1, 1997, Sheriff Kilgore was replaced by Mitchell.

2. There is some indication that Jordan's troubles during this time period were not solely with O'Brien. Jordan alleges that Mitchell implicitly threatened to fire him in August 1998 because Jordan complained to Mitchell about inappropriate comments made to him by Capt. Dearing. According to Jordan, Mitchell became infuriated when Jordan indicated that he would take legal action if Mitchell did not take steps to stop the improper treatment.

3. Prior to O'Brien's promotion, Jordan had never been suspended from work and had been disciplined only three times in over three years of working at the Department.

4. The parties disagree as to what occurred when Jordan was confronted with the charges against him. Jordan claims that he denied the charges, while Mitchell asserts that Jordan failed to deny them as such. Mitchell contends that Jordan's alleged failure to deny the charges was one reason why Jordan was fired.

dan to the local District Attorney's office for prosecution. A grand jury issued an indictment against Jordan and Jordan remains under criminal indictment today.

Four weeks later, John Silva also accused a white Department deputy, Glen Davis, of illegally providing him with alcohol and marijuana. The Department's subsequent investigation of Davis differed from the Jordan investigation in several ways: (1) Davis was promptly informed that he was under investigation, but Jordan was not; (2) Davis was polygraphed (and scheduled for a follow-up polygraph after the polygraph examiner concluded that he was not telling the truth), while Jordan was never polygraphed at all; and (3) the Department made an undercover audiotape of Davis *after* telling Davis that he was under investigation, but made an undercover video of Jordan *before* telling Jordan of the charges against him. Davis was not fired as a result of the investigation into his conduct and the charges against Davis were not referred for prosecution to the District Attorney. The investigation into Davis was closed in June 2000.

In January 2001, two EEOC investigators visited Mitchell and questioned him about the allegations that had been made against Davis. Mitchell subsequently ordered Davis to take the second polygraph. Shortly before his follow-up polygraph was to begin, Davis quit. The Department filed a form with the Texas Commission on Law Enforcement Standards and Education indicating that Davis had resigned. The form made no mention that Davis had resigned while under suspicion of illegal conduct. The same form that was filed regarding Jordan indicated that Jordan had been terminated for illegal conduct, including the acceptance of bribes.

Based upon this factual scenario, the United States of America ("United States") filed this lawsuit alleging two independent violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq* .. First, the United States alleges that Defendants discriminated against Jordan by subjecting him to disparate discipline. Secondly, the United States alleges that Defendants violated Title VII by retaliating against Jordan because he complained to Department officials about what he perceived to be discrimination and because he complained about similar problems to the EEOC. Jordan subsequently intervened, adding claims under 42 U.S.C. § 1983, 42 U.S.C. § 1981 and the Omnibus Crime Control and Safe Street Act of 1978.

## II.

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). When one party moves for summary judgment, the non-moving party must set forth specific facts showing that there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Issues of material fact are "genuine" only if they require resolution by a trier of fact. *See id.* at 248, 106 S.Ct. at 2510. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. Only disputes over facts that might affect the outcome of the lawsuit under governing law will preclude the entry of summary judgment. *See id.* at 247–48, 106 S.Ct. at 2510. Nevertheless, if the evidence is such that a reasonable factfinder could find in favor of the nonmoving party, summary judgment should not be

granted. *See id.; see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Dixon v. State Farm Fire & Cas. Co.*, 799 F.Supp. 691 (S.D.Tex. 1992) (noting that summary judgment is inappropriate if the evidence could lead to different factual findings and conclusions). Determining credibility, weighing evidence, and drawing reasonable inferences are left to the trier of fact. *See Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513.

## III.

■ Title VII allows employees to sue their employers for discriminatory employment decisions. *See* 42 U.S.C. §§ 2000e–2(a), 2000e–5. Title VII defines "employer" as a "person in industry affecting commerce who has fifteen or more employees ...." 42 U.S.C. § 2000e(b). A person "includes one or more individuals, governments, governmental agencies, [or] political subdivisions ...." 42 U.S.C. § 2000e(a). While the Parties agree that Mitchell, in his official capacity, is a Title VII "employer" for purposes of this lawsuit, there is obvious disagreement as to whether Matagorda County qualifies as a Title VII "employer" as well. Thus, before proceeding with an analysis of the United States and Jordan's Title VII claim, the Court must first determine whether Matagorda County is an eligible Title VII employer.

In *Oden v. Oktibbeha County, Mississippi*, 246 F.3d 458 (5th Cir.2001), the Fifth Circuit addressed the precise issue presented here—whether a county was a deputy's "employer" for Title VII purposes. First, the Fifth Circuit explained that "federal law controls whether a person is an employer under Title VII, but courts can look to state law to understand the nature of the employment relationship." *Id.* at 465 (citing *Calderon v. Mar-*

*tin County*, 639 F.2d 271, 273 (5th Cir. 1981)). Subsequently, the Fifth Circuit examined the relevant state law and found that "Mississippi law allow[ed] a sheriff to appoint, remove, and fix the compensation of his deputies" and that "[t]he county's only responsibility was to approve the Sheriff's budget and allocate the necessary funds." 246 F.3d at 465. Therefore, because the Sheriff "was the elected official who made all decisions concerning promotions within the Sheriff's department, [the Sheriff] was Deputy Oden's employer for purposes of Title VII." *Id.*

In its Motion for Summary Judgment, Defendants argue that *Oden* controls in the present case because "Texas law, which allows a Sheriff to appoint, remove and fix compensation of his deputies, subject to the Commissioners Court's approval of the Sheriff's budget, is identical to Mississippi state law...." The Court agrees that Texas law grants a Sheriff the power to hire and fire deputies. *See* Tex. Loc.Gov't Code § 85.003 (providing that "[a] deputy serves at the pleasure of the sheriff"); *see also Brady v. Fort Bend County*, 145 F.3d 691, 701–02 (5th Cir. 1998) ("[U]nder Texas law no other official or governmental entity of the county exerts any control over the sheriff's discretion in filling available deputy positions"); *Bumstead v. Jasper County*, 931 F.Supp. 1323, 1329 (E.D.Tex.1996) (explaining that Texas law provides sheriff with virtually unbridled authority in making hiring and firing decisions regarding deputies). However, the Court disagrees with Defendants' assertion that Texas law allows a Sheriff to fix deputy compensation. Rather, Texas law provides a Commissioners Court with the power to determine the number of deputies to be appointed by the sheriff and the ability to fix the deputies' compensation. *See* Tex.Loc.Gov't Code §§ 151.002 & 152.011; *see also Commr's Court of Shelby County v. Ross*, 809 S.W.2d 754,

757 (Tex.App.—1991, no writ) (noting that a Texas County Commissioners Court possesses the authority to determine the number of deputies to be appointed and their compensation). Thus, the Mississippi statutory scheme discussed in *Oden* is distinguishable from the system that controls here in Texas.

The United States contends that the Texas statutory scheme, which grants County Commissioners the power to fix deputy salaries and determine the number of deputies to be appointed, is more analogous to the North Carolina system examined in *Spencer v. Byrd,* 899 F.Supp. 1439 (M.D.N.C.1995). In that case, the court held that a sheriff's deputy was an employee of the county for Title VII purposes because the county provided the deputy's compensation and had the power to establish and limit the number of deputies the sheriff could hire. *See id.* at 1441. While the sheriff in *Spencer* retained exclusive power to hire and fire deputies, the court reasoned that the county was a Title VII employer because it exercised a great deal of control over the deputies through its ability to fund or choose not to fund deputy positions. *See id.; see also Johnson v. Bd. of County Comm'rs for County of Fremont,* 859 F.Supp. 438, 442 (D.Col.1994) (holding that the economic ties between the Board of Commissioners and the sheriff demonstrated that the Board was the Title VII employer); *Manley v. Mobile County,* 441 F.Supp. 1351, 1355–56 (S.D.Ala.1977) (holding that sufficient ties existed between sheriff and county to hold that county was an employer under Title VII); *but see Ryals v. Mobile County Sheriff's Dept.,* 839 F.Supp. 25, 27 (S.D.Ala.1993) (holding that Alabama county was not employer of deputy sheriff, for Title VII purposes, absent evidence that county had any control over any area of deputy's employment; evidence that county issued checks for deputies from funds annually budgeted for sheriff's department was insufficient).

◼ Nonetheless, the *Spencer* decision is not binding on this Court. Therefore, instead of applying the holding of *Spencer,* the Court applies the Fifth Circuit's general test for evaluating Title VII employment relationships to the facts of this case. The Fifth Circuit evaluates employment relationships in the context of Title VII by using "a hybrid economic realities/common law control test that focuses on whether the alleged employer had the right to hire and fire, the right to supervise, the right to set the work schedule, paid the employee's salary, withheld taxes, provided benefits, and set the terms and conditions of employment." *Hathcock v. Acme Truck Lines,* 262 F.3d 522, 526 (5th Cir.2001). The right to control an employee's conduct is the most important component of this test. *See Deal v. State Farm County Mut. Ins. Co. of Texas,* 5 F.3d 117, 119 (5th Cir.1993). When examining the control component, the Fifth Circuit instructs courts to focus on whether the alleged employer has the right to hire and fire the employee, the right to supervise the employee, and the right to set the employee's work schedule. *See id.; Fields v. Hallsville Indep. Sch. Dist.,* 906 F.2d 1017, 1020 (5th Cir.1990). The economic realities component of the test focuses on whether the alleged employer paid the employee's salary, withheld taxes, provided benefits, and set the terms and conditions of employment. *See Deal,* 5 F.3d at 117; *Mares v. Marsh,* 777 F.2d 1066, 1068 (5th Cir. 1985).

The Court concludes that the undisputed facts of this case, when evaluated within the framework of the Fifth Circuit's hybrid test, mandate a conclusion that Matagorda County was not Jordan's employer for Title VII purposes. Under Texas law, Mata-

gorda County did not control Jordan. Rather, Texas law provided that Sheriff Mitchell was solely responsible for hiring, supervising, firing and setting his work schedule. While Matagorda County did pay Jordan's salary, this economic factor is less important than the control factor—which is completely lacking with respect to the County. Accordingly, Defendants' Motion for Summary Judgment is hereby **GRANTED** with respect to Plaintiffs' Title VII claims against Defendant Matagorda County.

### IV.

Plaintiffs' Title VII claims against Mitchell require a showing of intentional discrimination. To determine whether intentional discrimination exists, the Fifth Circuit applies the burden-shifting analytical framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See, e.g., Long v. Eastfield Coll.*, 88 F.3d 300, 304 (5th Cir.1996) (applying the *McDonnell Douglas* analysis to Title VII unlawful retaliation cases); *Johnson v. Chapel Hill Indep. Sch. Dist.*, 853 F.2d 375, 381 (5th Cir.1988) (applying the *McDonnell Douglas* analysis to Title VII differential treatment case).

Under the *McDonnell Douglas* framework, the Court employs a three-part test designed to ascertain a defendant's motivation in taking the challenged action. *See McDonnell Douglas*, 411 U.S. at 803–04, 93 S.Ct. at 1824–25; *Quintanilla v. K–Bin, Inc.*, 8 F.Supp.2d 928, 933 (S.D.Tex.1998). First, a plaintiff must establish a *prima facie* case by proving the elements of a discrimination claim. *See Russell v. McKinney Hospital Venture*, 235 F.3d 219, 222 (5th Cir.2000). If the plaintiff proves his *prima facie* case, a presumption of discrimination arises. *See Bodenheimer v. PPG Industries, Inc.*, 5 F.3d 955, 957

(5th Cir.1993). The burden of production then shifts to the defendant to rebut this presumption by articulating a legitimate, nondiscriminatory reason for the alleged discriminatory action. *See Russell*, 235 F.3d at 222; *Olitsky v. Spencer Gifts, Inc.*, 964 F.2d 1471, 1478 n. 19 (5th Cir.1992). A defendant meets this burden by proffering admissible evidence of an explanation that would be legally sufficient to justify a judgment for the defendant. *See Guthrie v. Tifco Indus.*, 941 F.2d 374, 376 (5th Cir.1991). This does not require that the defendant persuade the trier of fact that there was no intentional discrimination; the defendant need only produce evidence on that point. *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 507–08, 113 S.Ct. 2742, 2747–48, 125 L.Ed.2d 407 (1993).

Finally, if the defendant satisfies this burden, the presumption of discrimination established by the plaintiff's *prima facie* case is defeated. *See Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 n. 10, 101 S.Ct. 1089, 1095 n. 10, 67 L.Ed.2d 207 (1981). The plaintiff's burden of persuasion then arises, and he or she must produce evidence that the defendant's proffered reasons are merely pretexual, such that the real derivation of the action arose from an impermissible *animus*. *See id.* at 256, 101 S.Ct. at 1095. The plaintiff may succeed at this juncture, either by persuading the Court that a discriminatory reason more likely motivated the defendant, or by showing that the defendant's proffered explanation is not entitled to credence. *Id.* The ultimate burden of proving intentional discrimination rests at all times with the plaintiff. *See Hicks*, 509 U.S. at 507, 113 S.Ct. at 2749.

### *Disparate Discipline Claim*

■ To state such a *prima facie* case of direct discrimination under Title VII, Jordan must show that (1) he is a member of

a protected group; (2) he was qualified for his position; (3) despite his qualifications, he suffered an adverse employment action; and (4) he was replaced by a non-member of the protected class or non-members received more favorable treatment because of their status as non-members of the protected class. *See Daigle v. Liberty Life Ins. Co.*, 70 F.3d 394, 395 (5th Cir.1995); *Quintanilla*, 8 F.Supp.2d at 933–34. The Parties do not dispute that the first two elements of Plaintiffs' *prima facie* case are satisfied. Jordan belongs to a protected class (he is African–American) and was qualified for his position as deputy, at least until he was indicted for allegedly providing alcohol to inmates. Plaintiffs cannot establish the third element of their *prima facie* case, however, with respect to their disparate discipline claim.

 The Court of Appeals for the Fifth Circuit has held that the anti-discrimination statutes were designed to address ultimate employment decision, not every decision made by employers that arguably might have some tangential effect upon ultimate decisions. *See Dollis v. Rubin*, 77 F.3d 777, 781–82 (5th Cir.1995). Ultimate employment decisions include acts such as hiring, granting leave, discharging, promoting and compensating. *See Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 707 (5th Cir.1997). Where pay, benefits and level of responsibility remain the same, the plaintiff has not been subjected to an ultimate employment decision and cannot maintain a claim of discrimination. *See Watts v. Kroger Co.*, 170 F.3d 505, 512 (5th Cir.1999).

After considering the summary judgment evidence, the Court finds that the actions upon which Plaintiffs' disparate discipline claim is based are not ultimate employment decisions. Plaintiffs complain

that Jordan was disciplined in a disparate manner when he was "written-up" on several occasions, docked one day of leave and suspended on one occasion for three days. However, Plaintiffs do not present any evidence indicating that these actions affected Jordan's compensation, benefits or level of responsibility in any manner whatsoever. *See, e.g., McGarity v. Mary Kay Cosmetics*, No. 3:96–CV–3413–R, 1998 WL 50460, *5 (N.D.Tex. Jan.20, 1998) (indicating that a three-day suspension is not an "ultimate" employment decision for Title VII purposes). Thus, under the relevant authorities, Plaintiffs have failed to establish a *prima facie* case of direct discrimination under Title VII. Accordingly, Defendants' Motion for Summary Judgment is hereby **GRANTED** as to Plaintiffs' disparate discipline claim against Defendant Mitchell.

### Failure to Promote Claim

 While the United States does not allege discrimination based upon a failure to promote, Jordan appears to assert such a claim in his Memorandum in Opposition to Defendant's Motion for Final Summary Judgment.[5] However, Jordan's failure to promote claim fails, as a matter of law, because Jordan fails to establish the fourth element of his *prima facie* case, i.e. that the promoted deputies received more favorable treatment because of their status as non-members of a protected class. In fact, Jordan does not identify the promoted deputies at all, nor does he indicate whether those receiving promotions were members or non-members of a protected class. Accordingly, in the event that Jordan has asserted a direct discrimination claim based upon an alleged failure to promote, Defendants' Motion for Summary Judgment is hereby **GRANTED** with respect to that claim.

5. Jordan alleges: "In 1998 and 1999, Mr. Jordan applied for and was interviewed for three promations[sic]. He did not receive any of these positions. O'Brien was on two of the committees the[sic] refused to promote Mr. Jordan."

### Retaliation Claim

Next, Plaintiffs allege that Mitchell fired Jordan in retaliation because Jordan complained to Department officials about what he perceived to be discrimination and because he complained about similar problems to the EEOC. There are three elements to a *prima facie* case of retaliation under Title VII:(1) the plaintiff engaged in an activity protected by Title VII; (2) an adverse employment action occurred; and (3) a causal link existed between the protected activity and the adverse action. *See, e.g., Evans v. City of Houston*, 246 F.3d 344, 352 (5th Cir.2001). The Fifth Circuit has held that the "causal link" required in the third prong of the *prima facie* case for retaliation is not as stringent as the "but for" standard. *See id.* at 354 (citing *Long*, 88 F.3d at 305).

■ Clearly, the first two elements are satisfied. Jordan engaged in a protected activity (he filed a complaint with the EEOC) and subsequently suffered an adverse employment action (termination). The Court also concludes that Plaintiffs have established the third element by showing that within a very short time period after the EEOC charge form was mailed to Mitchell, Jordan was disciplined, docked one day of leave, reprimanded and then terminated.[6] Based upon this evidence, the Court believes that a reasonable jury could conclude that retaliation was the reason for Jordan's termination. Thus, Plaintiffs have successfully set forth a *prima facie* case of retaliation.

■ In response, Mitchell has articulated a legitimate, non-discriminatory reason for Jordan's termination—Mitchell's belief that Jordan had violated the law and departmental policy by providing alcohol to inmates. Because Mitchell has met his burden of production, the Court considers whether Plaintiffs have presented sufficient evidence upon which a reasonable jury could conclude that Mitchell's non-discriminatory reason is pretextual. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148, 120 S.Ct. 2097, 2109, 147 L.Ed.2d 105 (2000) (holding that "a plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated").

■ The Court observes that while the undisputed facts of this lawsuit clearly indicate an overwhelming animosity between Jordan and several Department employees, whether such animosity was the motivation behind Jordan's termination is much less clear. Still, in light of the summary judgment evidence presented by both sides, the Court finds that a genuine issue of material fact exists regarding whether Mitchell's reason for terminating Jordan is merely pretextual. Central to this decision is the evidence showing that although Jordan and Davis were both alleged to have provided alcohol to inmates, Jordan (who had recently filed an EEOC complaint against the Department) was terminated, while Davis (who had not filed an EEOC complaint) remained employed. Thus, the Court believes that granting summary judgment in favor of Sheriff Mitchell would be inappropriate in this instance.[7] Accordingly, Defendants' Motion for Summary Judgement is hereby **DENIED** with respect to Plaintiffs' retaliation claim.

### V.

■ Plaintiffs may pursue causes of action under both Title VII and § 1981

---

**6.** Notably, Jordan was disciplined and docked one day of holiday leave a mere *two days* after

the EEOC charge form was mailed to Mitchell.

**7.** The Fifth Circuit has long instructed that

against private employers to remedy discrimination in the private employment context. See *Oden*, 246 F.3d at 462 (citing *Runyon v. McCrary*, 427 U.S. 160, 174, 96 S.Ct. 2586, 2596, 49 L.Ed.2d 415 (1976)). Plaintiffs may also pursue a § 1983 cause of action against persons acting under the color of state law in order to assert their substantive rights under § 1981. *Oden*, 246 F.3d at 462. However, § 1981 does not create an independent remedial cause of action against local government entities. *See id.* at 464. Rather, "[s]ection 1983 remains the only provision to expressly create a remedy against persons acting under color of state law." *Id.* at 463. Accordingly, Jordan cannot maintain independent causes of action under both § 1981 and § 1983 against Defendants. As such, Defendants' Motion for Summary Judgement is hereby **GRANTED** with respect to Jordan's § 1981 claims.

## VI.

Section 1983 provides a cause of action against "[e]very person who, under color of any statute ... of any State ... subjects, or causes to be subjected, any citizen ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws...." 42 U.S.C. § 1983; *see also Moore v. Willis Indep. Sch. Dist.*, 233 F.3d 871, 874 (5th Cir.2000) (citing *Leffall v. Dallas Indep. Sch. Dist.*, 28 F.3d 521, 525 (5th Cir.1994)).

### Jordan's § 1983 Claim Against Mitchell

 It is well settled that "official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent." *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 n. 55, 98 S.Ct. 2018, 2036 n. 55, 56 L.Ed.2d 611 (1978); *see also Turner v.*

*Houma Mun. Fire and Police Civil Serv.*, 229 F.3d 478, 483 (5th Cir.2000); *Welch v. Laney*, 57 F.3d 1004, 1007 (11th Cir.1995); *Shuford v. Alabama State Bd. of Educ.*, 968 F.Supp. 1486, 1515 (M.D.Ala.1997). Thus, the Court affords Jordan's § 1983 claim against Sheriff Mitchell in his official capacity the same treatment that it would afford a § 1983 claim by Jordan against the Sheriff's Department itself.

Section 1983 only provides a cause of action against local governmental units, such as a Sheriff's Department, when the allegedly improper action was taken pursuant to an official policy or governmental custom. *See Monell*, 436 U.S. at 690, 98 S.Ct. at 2035-36. However, Jordan makes absolutely no reference to any Departmental policy or custom in his Intervenor's Complaint in Intervention or in his Memorandum in Opposition to Defendants' Motion for Final Summary Judgment. Moreover, the Supreme Court's *Monell* decision clearly bars governmental liability under § 1983 when the liability is premised upon a theory of *respondeat superior*. *See id.* at 694, 98 S.Ct. at 2037; *see also Leffall*, 28 F.3d at 525; *Voorhies v. Conroe Indep. Sch. Dist.*, 610 F.Supp. 868, 870 (S.D.Tex. 1985). Given that Jordan bases his claims against Sheriff Mitchell solely on the conduct of the Department's employees (namely, O'Brien and Mitchell), Jordan's attempt to establish a valid § 1983 cause of action against Sheriff Mitchell fails as a matter of law. Accordingly, Defendants' Motion for Summary Judgment is hereby **GRANTED** with respect to the § 1983 claim against Defendant Mitchell.

### Jordan's § 1983 Claim Against Matagorda County

Likewise, Jordan fails to reference any Matagorda County policy or custom in his

summary judgment should be used cautiously in Title VII cases, because such cases usually involve the examination of motive and intent. *See Jones v. W. Geophysical Co. of Am.*, 669

F.2d 280, 283 (5th Cir.1982); *Foster v. Swift & Co.*, 615 F.2d 701, 702 (5th Cir.1980); *Hayden v. First Nat'l Bank*, 595 F.2d 994, 997 (5th Cir.1979).

Intervenor's Complaint in Intervention or in his Memorandum in Opposition to Defendants' Motion for Final Summary Judgment. In fact, Jordan does not discuss his § 1983 claim against Matagorda County at all, other than to cite § 1983 as a basis for this Court's jurisdiction over this lawsuit. Accordingly, Defendants' Motion for Summary Judgment is hereby **GRANTED** with respect to the § 1983 claim against Defendant Matagorda County.

### VII.

Jordan also asserts a cause of action against Defendants pursuant to the "Omnibus Crime Control and Safe Street Act of 1978, as amended, 42 U.S.C. § 3766(c)(1)." After an exhaustive search of federal law, the Court is unable to ascertain the existence of such a statute. The Court acknowledges that there is an Omnibus Crime Control and Safe Street Act of 1968, 18 U.S.C. § 2510 *et seq.*, but notes that the 1968 Act bears no relevance to the alleged employment discrimination at issue here.[8] Moreover, the precise code subsection cited by Jordan, 42 U.S.C. § 3766(c)(1), does not exist.[9] Accordingly, Defendants' Motion for Summary Judgment is hereby **GRANTED** with respect to Jordan's claims under the Omnibus Crime Control and Safe Street Act of 1978, as amended, 42 U.S.C. § 3766(c)(1).

In sum, the Court finds that summary judgment in favor of the Defendants is warranted with respect to all of Plaintiffs' claims, with the sole exception of Plaintiffs' Title VII retaliation claim against Sheriff Mitchell, in his official capacity. The Court reminds the Parties that this case is set for jury trial on January 28, 2002 and hereby **ORDERS** that each side will be allotted a *maximum* of one and one-half days to put on its case. The Court fully expects that all Parties will act in a manner consistent with reaching an expeditious, economical and efficacious resolution of the matter at hand.

**IT IS SO ORDERED**

---

**8.** The Omnibus Crime Control and Safe Street Act of 1968, 18 U.S.C. § 2510 et seq., was recently amended by the Intelligence Authorization Act for Fiscal Year 2002, Pub.L. No. 107–08, 115 Stat. 1394. The Act addresses intelligence and intelligence-related activities of the United States Government, the Community Management Account, and the Central Intelligence Agency Retirement and Disability System. Moreover, it does not mention employment discrimination.

**9.** The Court notes the existence of 42 U.S.C. § 3766(c). However, that provision deals with the annual report made by the Director of the National Institute of Justice to the President, Attorney General and the Congress. Clearly, § 3766(c) bears no relevance upon this lawsuit.